**UNITED STATES of America, Appellee,**

v.

**Norman TURKISH, Defendant-Appellant.**

**Nos. 608, 795, Dockets 79–1326, 79–1396.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1980.

Decided May 27, 1980.

Ronald Podolsky, New York City, for defendant-appellant.

Allen R. Bentley, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., Gregory L. Diskant, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before LUMBARD, MANSFIELD and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This criminal appeal concerns primarily the issue of whether a defendant is entitled to have immunity conferred upon defense witnesses who invoke their privilege against self-incrimination. The appeal is brought by Norman Turkish, who was convicted by a jury in the Southern District of New York (Vincent L. Broderick, Judge) of evading income taxes and filing false income tax returns, 26 U.S.C. §§ 7201, 7206, and con-spiring to defraud the United States, 18 U.S.C. § 371. The trial of Turkish and three co-defendants lasted 11 weeks. Turkish and one co-defendant were found guilty; only Turkish appeals.

The Government's evidence established that Turkish was a principal participant in a scheme that used fraudulent means to enable C.R. Rittenberry & Associates, Inc., an oil company, to create artificial tax losses in one year, offset by equally artificial taxable gains in a subsequent year, thereby postponing for a year the taxes on millions of dollars of corporate income. The scheme involved the use of tax "straddles," the simultaneous purchase and sale at different prices of equal numbers of commodity futures contracts to be performed in different months. In the normal use of tax straddles, opportunities for arguably lawful tax avoidance are created when the market price varies from the prices at which the original contracts were both bought and sold. If the market declines, the trader offsets his purchase with an equivalent sale, thereby locking in a tax loss on his original purchase. He then offsets his original sale contract with an equivalent purchase, thereby locking in an approximately equal profit on his original sale contract. He benefits when the profit is taxable in the year following realization of the loss. In normal transactions the trader takes the risk that market price movements will be too narrow to create much opportunity for tax postponement and also the more serious risk that prices will not move uniformly with respect to both his original contracts. In the latter event the profit available to be locked in may be less than the locked-in loss. Turkish and others avoided these risks by fraudulently manipulating virtually the entire business of one trading ring on the New York Cotton Exchange, the Crude Oil Futures Market. This enabled them to move prices up and down at will, so that Rittenberry could take short-term capital losses during one tax year and defer an equal amount of off-setting capital gain to a subsequent year, all with no risk and a considerable saving in the postponement of

taxes. Turkish not only orchestrated the fraudulent aspects of the scheme but also evaded taxes on the money he received as compensation for his role.

## I.

### The Indictment

■■■ Turkish contends that his conviction should be reversed because the conspiracy count of the indictment (Count One) did not charge an offense and was unconstitutionally vague. The conspiracy count alleged that Turkish and others conspired to "defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury in the collection of income taxes." The crime of conspiring to defraud the United States, 18 U.S.C. § 371, includes acts that "interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery," *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). The creation of artificial tax losses for a business by fraudulent manipulation of prices in a commodity market qualifies as such an act. Turkish contends that there would have been no crime had the oil company not taken the resulting losses as tax deductions. Even if the manipulation of prices was not, by itself, a federal offense, it became evidence of a federal offense when it was done· to avoid federal taxes. The Government alleged that Turkish's activities on the Crude Oil Futures market were part of a conspiracy that involved other acts, not that these activities constituted the entirety of the crime.

The indictment is also sufficiently precise to meet the requirements of the Constitution and the Federal Rules of Criminal Procedure. Fed.R.Crim.P. 7(c) states, in part: "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Count One specified Turkish's alleged efforts to manipulate the Crude Oil Market in order to create tax losses for his co-defendant's client. This was sufficient to inform him of the charges

against him, and to enable him to prepare his plea and his defense accordingly. See *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

## II.

### Defense Witness Immunity

The claim for defense witness immunity arose in the following circumstances. The Government presented its case by calling a number of witnesses involved in the fraudulent transactions, several of whom were co-conspirators. Of these, three had pleaded guilty to participation in the conspiracy and had received letter agreements that they would not be prosecuted for any other commodity market crimes or related tax offenses if they testified truthfully. Two other prosecution witnesses who had not been indicted received similar letters, one of which was sufficient to persuade its recipient to return from Switzerland for the trial. In addition, one prosecution witness was formally granted "use" immunity under 18 U.S.C. § 6002.

During the trial, and after the Government had concluded its case, Turkish and his co-defendants moved that seventeen of the prospective defense witnesses be granted "use" immunity and required to testify under 6002. They argued that these witnesses could provide exculpatory testimony, but would invoke their Fifth Amendment privilege and decline to testify unless compelled to do so. Judge Broderick invited the Government to consider granting "use" immunity to these witnesses pursuant to 6002. The Government did consider the matter, but decided not to grant immunity. Judge Broderick then reserved decision on defendants' motion until after the trial, at which time the defendants moved for a new trial or acquittal. On August 23, 1979, Judge Broderick denied the defendants' motion.

In a subsequent opinion, *United States v. Turkish* (S.D.N.Y.1979), Judge Broderick set forth his analysis of the issue and his reasons for denying the motion. Judge Broderick concluded that the Compulsory Proc-

ess Clause of the Sixth Amendment does not give a defendant the right to require immunization of a witness, but that such a right is "probably" contained in the Due Process Clause of the Fifth Amendment. *Id.* However, he declined to accord the defendants the benefit of this "probable" Fifth Amendment right to defense witness immunity for two reasons. First, he ruled that the defendants' motion was untimely, since it should properly have been made at the beginning of the trial. Second, he concluded that defense witness immunity would be available only to secure testimony that was material and exculpatory and that the defendants had not shown that any of the witnesses for whom they sought immunity would give material, exculpatory testimony.

To assess Turkish's challenges to these rulings we deem it appropriate to explore the concept of defense witness immunity, a matter arising with increasing frequency before this and other courts. See, *e. g.*, *United States v. De Palma*, 476 F.Supp. 775 (S.D.N.Y.1979), *appeal pending sub nom. United States v. Horwitz*, No. 79–1315 (2d Cir.); *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980).

Granting immunity to a defense witness at the defendant's request seems to have been considered for the first time, in a reported decision, by Chief Justice Burger, then a Circuit Judge, as dictum in *Earl v. United States*, 361 F.2d 531, 534 n.1 (D.C. Cir. 1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967). Since then it has been much discussed by courts and commentators.[1] Interest in defense witness immunity was considerably heightened after Congress enacted the "use" immunity statute, 18 U.S.C. §§ 6001–6005, in 1970, and the Supreme Court subsequently upheld its constitutionality, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653,

32 L.Ed.2d 212 (1972). No longer did an immunity grant forbid prosecution of the witness for crimes referred to in his testimony ("transactional" immunity). Now the Government could still prosecute the witness; it was barred only from making any use of his immunized testimony, either directly by putting the testimony in evidence at the witness's trial, or indirectly by obtaining other evidence from leads that the testimony supplied.

Claims for defense witness use immunity have been uniformly rejected by this Court, *United States v. Gleason*, 616 F.2d 2 (2d Cir. 1979); *United States v. Praetorius*, 622 F.2d 1054 (2d Cir. 1979, *modified on rehearing*, May 7, 1980); *United States v. Lang*, 589 F.2d 92, 96 n.1 (2d Cir. 1978); *United States v. Wright*, 588 F.2d 31, 33–37 (2d Cir. 1978), *cert denied*, 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979); *United States v. Stofsky*, 527 F.2d 237, 249 (2d Cir. 1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976); see also *United States v. Housand*, 550 F.2d 818, 823–824 (2d Cir.), *cert. denied*, 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977), and by almost all circuits to consider the matter, *United States v. Lenz*, 616 F.2d 960 (6th Cir. 1980); *United States v. Smith*, 542 F.2d 711, 715 (7th Cir. 1976); *United States v. Alessio*, 528 F.2d 1079, 1081–82 (9th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); *Thompson v. Garrison*, 516 F.2d 986, 988 (4th Cir.), *cert. denied*, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975); see *Earl v. United States*, 361 F.2d 531 (D.C. Cir. 1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967) (transactional immunity). The claim is a matter of divided opinion in the Third Circuit, compare *United States v. Rocco*, 587 F.2d 144 (3d Cir. 1978); *United States v. Berrigan*, 482 F.2d 171 (3d

---

1. The commentators have generally been favorable to the idea of defense witness immunity. *See* Westen, *Compulsory Process*, 73 Mich.L. Rev. 71 (1974); Note, *Right of the Criminal Defendant to the Compelled Testimony of Witnesses*, 67 Colum.L.Rev. 953 (1967); Note, *Separation of Powers and Defense Witness Immunity*, 66 Geo.L.J. 51 (1977); Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses*, 91 Harv.L.Rev. 1266 (1978); Note, *A Re-Examination of Defense Witness Immunity: A New Use for* Kastigar, 10 Harv.J.Legis. 74 (1974); Note, *The Public Has a Claim to Every Man's Evidence: The Defendant's Constitutional Right to Witness Immunity*, 30 Stan.L.Rev. 1211 (1978).

Cir. 1973), with *Government of the Virgin Islands v. Smith, supra; United States v. Herman,* 589 F.2d 1191, 1203–04 (3d Cir. 1978), *cert. denied,* 442 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); *United States v. Morrison,* 535 F.2d 223 (3d Cir. 1976). Additional support for the claim has been expressed by the former Chief Judge of the District of Columbia Circuit, see *United States v. Gaither,* 539 F.2d 753 (D.C. Cir.) (Bazelon, C. J., concurring in denial of rehearing en banc); *cert. denied,* 429 U.S. 961, 97 S.Ct. 388, 50 L.Ed.2d 329 (1976), *United States v. Leonard,* 494 F.2d 955, 985 n.79 (D.C. Cir. 1974) (Bazelon, C. J., concurring and dissenting), and by two District Courts, *United States v. De Palma, supra,* and *United States v. La Duca,* 447 F.Supp. 779 (D.N.J.1978), *aff'd on other grounds sub nom. United States v. Rocco, supra,* in addition to Judge Broderick in this case.

The only federal appellate decisions ruling in favor of defense witness immunity appear to be the Third Circuit decisions in *Morrison* and *Smith.* In *Morrison* a divided panel of the Third Circuit reversed a conviction on the ground that prosecutorial misconduct had caused a defense witness to withhold testimony out of fear of self-incrimination. As a remedy for the misconduct, the Court ordered that upon a retrial, the Government face the choice of either granting the witness use immunity or having the defendant acquitted.

*Smith* involved a totally bizarre situation. A juvenile defendant sought use immunity for a juvenile defense witness. The office of the Virgin Islands Attorney General, who had exclusive jurisdiction to prosecute both the defendant and the witness, was agreeable to use immunity for the witness. However, this local prosecuting office, as a matter of "prosecutorial courtesy," 615 F.2d at 967, conditioned its approval upon the consent of the United States Attorney, who inexplicably declined to consent. In a thoughtful opinion Judge Garth reversed the conviction and remanded for determination of whether use immunity should have been conferred under standards explicated in the Court's decision.

These standards rest on two different concepts. First, Judge Garth considered the power of a court to order the prosecutor to grant statutory use immunity pursuant to 18 U.S.C. § 6002. Such "statutory" immunity was held to be available for a defense witness with relevant testimony, 615 F.2d at 969 n.7, when the defendant could show that the prosecutor's decision not to confer immunity was made "with the deliberate intention of distorting the judicial fact finding process," *id.* at 966, a standard the Third Circuit had previously articulated in *United States v. Herman, supra,* 589 F.2d at 1204. Secondly, Judge Garth considered what he called "judicial" immunity, the power of a court, unaided by statute, to order that a witness's testimony cannot be used against him. Again applying a standard earlier announced in *United States v. Herman, supra,* Judge Garth held that judicial immunity, *i. e.,* court-ordered use immunity, was available for a witness "capable of providing clearly exculpatory evidence" when the Government can present no "strong countervailing interest." 615 F.2d at 970.

Though *Morrison* and *Smith* stand in sharp contrast to the uniform holdings of other federal appellate decisions that have rejected defense witness immunity, some of these decisions have been careful to deny the claim only with respect to the precise facts presented, *e. g., United States v. Wright, supra; United States v. Alessio, supra.* Furthermore, two of our decisions have explicitly left open the possibility that defense witness immunity might be required if grants of use immunity to prosecution witnesses resulted in an "unfair advantage." *United States v. Gleason, supra,* 616 F.2d at 28; *United States v. Lang, supra,* 589 F.2d at 96–97. In light of this state of the case law, further consideration of the constitutional bases for defense witness immunity is warranted. Resort is usually made to the Sixth and Fifth Amendments.

■ The established content of the Sixth Amendment does not support a claim for defense witness immunity. Traditionally,

the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does nor carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination. *United States v. Lacouture*, 495 F.2d 1237 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *Myers v. Frye*, 401 F.2d 18 (7th Cir. 1968); *Johnson v. Johnson*, 375 F.Supp. 872 (W.D. Mich.1974); *Holloway v. Wolff*, 351 F.Supp. 1033 (D.Neb.1972); see *Royal v. Maryland*, 529 F.2d 1280, 1283 (4th Cir. 1976) (Winter, J., dissenting). While the prosecutor may not prevent or discourage a defense witness from testifying, *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *United States v. Morrison, supra*, it is difficult to see how the Sixth Amendment of its own force places upon either the prosecutor or the court any affirmative obligation to secure testimony from a defense witness by replacing the protection of the self-incrimination privilege with a grant of use immunity.

Arguably there is a more plausible basis for defense witness immunity in the more general and perhaps developing requirement of basic fairness protected by the Fifth Amendment's Due Process Clause.[2] The appeal to constitutionally protected fairness proceeds from two basic arguments. First, as this Circuit hinted in *Gleason* and *Lang*, unfairness may inhere in some situations because the Government's grant of use immunity to its witnesses affords it an advantage over the defendant's ability to present a defense. Secondly, to the extent that a trial is viewed as a search for the truth, denial of defense witness immunity may in some circumstances unfairly thwart that objective.[3]

The first contention, based on equalizing the powers of the prosecution and the defense, is entirely unpersuasive. A criminal prosecution, unlike a civil trial, is in no sense a symmetrical proceeding. The prosecution assumes substantial affirmative obligations and accepts numerous restrictions, neither of which are imposed on the defendant. The prosecution must prove the defendant's guilt beyond a reasonable doubt to the satisfaction of all the jurors; it may not obtain the defendant's testimony, suppress exculpatory evidence, nor retry the defendant after acquittal, even though errors prejudicial to the Government occurred. The defendant, by contrast, may prevail without offering any proof at all; he need not disclose whatever inculpatory evidence he discovers, may avoid conviction by persuading a single juror that reasonable doubt exists, and may challenge a conviction by direct appeal and subsequent collateral attack.

The system of criminal law administration involves not only this procedural imbalance in favor of the defendant, but also important aspects of the Government's law enforcement power that are not available to the defendant. Subject to constitutional and statutory limits, the Government may arrest suspects, search private premises, wiretap telephones, and deploy the investigative resources of large public agencies. Few would seriously argue that the public interest would be well served either by extending all of these powers to those accused of crime or by equalizing the procedural burdens and restrictions of prosecution and defendant at trial. Viewed in isolation, there is a surface appeal to the equal availability of use immunity for prosecution and defense witnesses. But in the context of criminal investigation and criminal trials, where accuser and accused have inherently different roles, with entirely different pow-

---

2. Defense witness immunity, a concept first developed only in the 1960's, and regarded as plausible only since the passage of the use immunity statute, cannot qualify as a due process right on any theory that it is part of the "compelling traditions of the legal profession." *Rochin v. California*, 342 U.S. 165, 171, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

3. We put to one side the situation, illustrated by *United States v. Morrison, supra*, where a court uses the option of defense witness immunity as part of a remedy for prosecutorial misconduct directed at the witness. There is no claim in this case of any such misconduct.

ers and rights, equalization is not a sound principle on which to extend any particular procedural device. At a minimum, such a principle will not support a constitutional interpretation of Fifth Amendment fairness.

■ The second argument, based on the need to pursue the truth, has somewhat greater force. As a general rule the Government is properly obliged to divulge exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). That principle, however, has heretofore been limited to evidence in the Government's possession and has not been extended to create a Government obligation to assist the defense in extracting from others evidence the Government does not have. Moreover the concept of a trial as a search for the truth has always failed of full realization whenever important facts are shielded from disclosure because of a lawful privilege. The key fact needed to prove a defendant's innocence may be contained in a client's privileged admission to his attorney, or a husband's privileged admission to his wife, as well as in the testimony of a witness protected by the privilege against self-incrimination. Nevertheless, it must be acknowledged that since the advent of immunity statutes, the self-incrimination privilege, unlike any other, can be displaced without any impairment of the legally protected rights of the holder of the privilege. And unlike transactional immunity, use immunity does not improve the legal position of the holder of the privilege; it leaves his legal rights precisely as they were before he testified. However, the grant of use immunity does implicate public interests, and any assessment of a claim for defense witness use immunity must reckon with those public concerns.

In the first place, while the prosecution remains theoretically free under *Kastigar* to prosecute a witness granted use immunity, the obstacles to a successful prosecution can be substantial. The Government has a "heavy burden" to prove that its evidence against the immunized witness has not been obtained as a result of his immunized testimony. *Kastigar v. United States, supra,* 406 U.S. at 461, 92 S.Ct. at 1665. While this burden can be met by cataloguing or "freezing" the evidence known to the Government prior to the immunized testimony, that technique is not available when continuing investigations disclose vital evidence after, though not resulting from, the immunized testimony. See *SEC v. Stewart*, 476 F.2d 755, 762 (2d Cir. 1973) (Timbers, J., dissenting). Moreover, to meet its burden of proving that prosecution of the immunized witness was not benefitted in any way by his immunized testimony the prosecutors most knowledgeable about an investigation may in some circumstances be obliged to forgo any further contact with the witness and arrange for a new team of investigators and prosecutors to pursue the case against him. See *United States v. Kurzer*, 534 F.2d 511 (2d Cir. 1976).

Secondly, awareness of the obstacles to successful prosecution of an immunized witness may force the prosecution to curtail its cross-examination of the witness in the case on trial to narrow the scope of the testimony that the witness will later claim tainted his subsequent prosecution. While the witness cannot prevent prosecution and secure an immunity "bath" by broadening the scope of his answers, as he could if testifying under a grant of transactional immunity, his fulsome answers may substantially lessen the likelihood of any successful prosecution.

Finally, there is considerable force to the Government's apprehension that defense witness immunity could create opportunities for undermining the administration of justice by inviting cooperative perjury among law violators. Co-defendants could secure use immunity for each other, and each immunized witness could exonerate his co-defendant at a separate trial by falsely accepting sole responsibility for the crime, secure in the knowledge that his admission could not be used at his own trial for the substantive offense. The threat of a perjury conviction, with penalties frequently far below substantive offenses, could not be relied upon to prevent such tactics. More-

over, this maneuver would substantially undermine the opportunity for joint trials, with consequent expense, delay, and burden upon disinterested witnesses and the judicial system.

How these substantial concerns are to be weighed against the defendant's interest in securing truthful exculpatory testimony through defense witness immunity turns in large part upon whether the balancing of these interests is appropriately a judicial function. The Government suggests it is not, contending that the granting of immunity is pre-eminently a function of the Executive Branch. See *Ullmann v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). On the other hand, the judiciary has constitutional responsibilities for the fairness of a trial. Moreover, as Judge Garth has argued in *Smith*, the court can accord use immunity without directly acting in the domain of either the Legislative or Executive Branch. A court can rule that testimony may not be used against a witness without adding any gloss to the use immunity statute or directing the prosecutor to use his statutory authority. Judicially created use immunity, albeit premised on constitutional considerations, was fashioned by the Supreme Court in *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (witness's compelled testimony barred from use by another jurisdiction), and in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (defendant's testimony at suppression hearing barred from use at trial). See also *In re Grand Jury Investigation*, 587 F.2d 589 (3d Cir. 1978) (testimony given to assert Speech and Debate Clause defense); *United States v. Immon*, 568 F.2d 326 (3d Cir. 1977) (testimony given to assert Double Jeopardy Clause defense).

However, a court cannot determine whether any constitutional provision requires a judicial grant of use immunity without assessing the implications upon the Executive Branch, both those that flow from a grant of use immunity and those that flow from an adjudication of whether such immunity might be appropriate in a particular case. The concerns previously expressed about the risk to other successful prosecutions are matters normally better assessed by prosecutors than by judges. Surely a court is in no position to weigh the public interest in the comparative worth of prosecuting a defendant or his witness, although if a court decides that immunity is required, it can always leave that ultimate assessment with the prosecutor by advising that trial of the defendant will continue only if the witness's testimony is immunized. But confronting the prosecutor with a choice between terminating prosecution of the defendant or jeopardizing prosecution of the witness is not a task congenial to the judicial function.[4]

Still it may be contended, as Judge Garth did in *Smith*, that a court ought to determine in each case whether the risks to the public interest in conferring defense witness immunity outweigh the needs of the defendant. *Smith* suggests two types of inquiry: whether the prosecutor's opposition to defense witness immunity stems from "the deliberate intention of distorting the fact finding process," 615 F.2d 968, or whether the prosecutor can present "strong countervailing interest," *id.* at 974, to the

---

4. We do not regard the limited immunity judicially created for the defendant in *Simmons v. United States, supra,* to be analogous to use immunity for a witness. In *Simmons* the Supreme Court ruled that a defendant's testimony at a suppression hearing, presented to establish standing to assert a Fourth Amendment claim, could not be introduced at trial. The Court focused on exclusion of the defendant's testimony, and did not mention creation of formal use immunity, *i. e.*, prohibition against using testimony or any leads from it. Perhaps that was the implicit result of the decision, but, even if so, immunization of a statement concerning Fourth Amendment standing carries very little risk of impeding prosecution of the defendant for the substantive offense. Furthermore, *Simmons* creates an immunity to avoid the dilemma of a defendant's choosing between vindicating his Fourth Amendment right or maintaining his self-incrimination privilege at trial. Nothing comparable is presented when a defendant finds that evidence he hoped to present is unavailable because other persons prefer to assert their own privilege.

defendant's need for clearly exculpatory evidence. Either inquiry will propel a trial court into uncharted waters. Focusing upon the prosecutor's intent will often lead to exploration and premature disclosure of the pending status of an investigation against the witness. Moreover, a prosecutor without enough evidence to seek indictment of a witness may legitimately prefer to maintain his option to prosecute on the basis of later information. It cannot fairly be argued, where the prosecutor declines to consent to use immunity, that the absence of present intention to prosecute is evidence of intention to distort the fact-finding process. Alternatively, weighing the "countervailing interest" in not granting defense witness immunity will in all likelihood prove to be as elusive a task as formulating any meaningful standards for the assessment. In the extraordinary fact situation presented by the *Smith* case, where the prosecutor opposing use immunity does not even have jurisdiction to prosecute the witness, the public interest in not granting defense witness immunity appears to be non-existent. But in most situations where defense witness immunity is likely to be sought, some legitimate opposing prosecution interest will exist, and constitutional fairness is not a satisfactory standard against which to assess such interests.

When any novel legal proposition is urged upon a court, there is a natural judicial reluctance to say "never." Indeed, the extraordinary fact situation presented by the *Smith* case illustrates a situation where denial of defense witness immunity can be said to deny the defendant the fair trial guaranteed by the Due Process Clause. Yet it is important to recognize that *Smith* really does not involve a use of the Due Process Clause to balance the public interest in withholding immunity against the defense need for it. In *Smith* the prosecutor with jurisdiction over the witness was willing to grant use immunity. Opposition came from a prosecutor without jurisdiction. This was simply an instance of a prosecutor interfering, for no apparent reason, to suppress evidence that was about to become available to the accused. We have

no dispute with the holding in *Smith*. However, in light of all the considerations previously discussed, we find ourselves in fundamental disagreement with the standards outlined in that decision. Without precluding the possibility of some circumstances not now anticipated, we simply do not find in the Due Process Clause a general requirement that defense witness immunity must be ordered whenever it seems fair to grant it. The essential fairness required by the Fifth Amendment guards the defendant against overreaching by the prosecutor, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (failure to disclose promise not to prosecute government witness); *Waley v. Johnston*, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942) (threat to use manufactured evidence); *Taylor v. Lombard*, 606 F.2d 371 (2d Cir. 1979) (knowing use of perjured testimony); *United States v. Westbo*, 576 F.2d 285 (10th Cir. 1978) (disobedience of court ruling excluding admission of other crimes evidence); *cf. Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (repudiation of plea bargain promise), and insulates him against prejudice. See, *e. g., Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (judge had pecuniary interest in result); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (trial subject to excessive publicity); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (prosecution witnesses present in jury room during deliberations); *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (judge also served as one-person grand jury); *Moore v. Dempsey*, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923) (trial occurred under threat of mob violence). It does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges.

The circumstances of this case do not remotely approach a situation where lack of defense witness immunity could be found to deny constitutionally protected fairness. In the first place, the demand for immunity was initially made in the middle of the trial and properly found to be untimely by Judge Broderick for reasons set

out in the margin.[5]  See *United States v. Taylor*, 562 F.2d 1345, 1361 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Jones*, 487 F.2d 676, 679 (9th Cir. 1973); *United States v. Grooms*, 454 F.2d 1308, 1311 (7th Cir.), *cert. denied*, 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 104 (1972).  Secondly, Judge Broderick carefully considered the expected testimony of the witnesses sought to be immunized and concluded that none of them would provide material, exculpatory evidence.  Their testimony would either have been cumulative, immaterial, or impeaching only on collateral matters.  Thus, the trial court's refusal to order the prosecutor to confer use immunity was plainly correct.

■  We have expressed our thoughts on the issue at some length because we do not agree with Judge Broderick's views on the general availability of defense witness immunity, nor do we wish to see criminal trials regularly interrupted by wide-ranging inquiries concerning the specific pros and cons of defense witness immunity in a particular case.  In fact, we think trial judges should summarily reject claims for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution.  No hearing should be held to establish such status.  The prosecutor need only show that the witness has been indicted or present to the court *in camera* an *ex parte* affidavit setting forth the circumstances that support the prosecutor's suspicion of the witness's criminal activity.  No duty is imposed upon the prosecutor; he simply has an option to rely upon the witness's status as an actual or potential target of prosecution to foreclose any inquiry concerning immunity for that witness.  If a case should arise where the witness is not an indicted defendant and the prosecutor cannot or prefers not to present any claim that the witness is a potential defendant, and if the defendant on trial demonstrates that the witness's testimony will clearly be material, exculpatory, and not cumulative, it will be time enough to decide whether in those circumstances a

---

5.  Judge Broderick's detailed findings were as follows:

Some 171 days elapsed between the first pre-trial conference herein and the beginning of trial.  Defendants were aware that the government's investigation of the crude oil market was continuing during this period; this very fact was argued to me by defense counsel in seeking a substantial adjournment of the original date.  Yet it was never drawn to my attention during this period that defendants had any intention of requesting immunization of witnesses.  The crude oil investigation was initiated in the New York County District Attorney's office, and the investigation was conducted by Assistant District Attorney Michael F. Baumeister of that office and by Assistant United States Attorney Paul Vizcarrondo for the United States Attorney.  These two men jointly represented the government in all pre-trial proceedings in this case, and they jointly presented the government's case at trial.  The case was a complicated one, involving the complex organization and operations of the commodities futures market.  Once trial began the full time of the two government attorneys, Baumeister and Vizcarrondo, was fully absorbed with the presentation of the case in the trial room.

The demand that witnesses be immunized was made at the close of the government's case, in the middle of the trial, when neither of the men in charge of the investigation was in a position—because of their trial duties—either to make a meaningful recommendation to the United States attorney that the testimony requested might be necessary to the public interest, or to shoulder the 'heavy burden' (*Kastigar v. United States*, 406 U.S. 441, 461 [92 S.Ct. 1653, 32 L.Ed.2d 212] (1972) of marshalling the evidence then available with respect to any of the proposed witnesses whom the government might indict in the future.

The resourcefulness of defense counsel at trial, and their thorough knowledge and understanding of the case, persuade me that they should have been able to anticipate that many prospective witnesses would invoke the Fifth Amendment, and in my judgment they should have presented to the prosecutors and to myself prior to trial the substance if not the details of the applications made at the close of the government's case.

Thus the applications by defendants were not timely.  The effects of their untimeliness were to introduce the element of double jeopardy into a situation where it did not belong; and to force the government to consider their applications for immunity to 17 persons involved in an investigation at a time when the two government attorneys with the requisite knowledge were engaged on a full time basis in the presentation of a complex case on trial.

court has any proper role with respect to defense witness immunity. Of course, our limited interpretation of the Fifth Amendment's application to this issue does not preclude broader action by United States Attorneys under the existing authority of § 6002 nor legislative action to define circumstances in which defense witness immunity should be granted.

Affirmed.

LUMBARD, Circuit Judge (concurring in part; dissenting in part):

I concur in affirming the conviction. I dissent, however, from the observations in Judge Newman's opinion which imply that under certain circumstances the district court would be under the duty of inquiring into whether or not the prosecution should grant use immunity to a prospective defense witness. In my view it is not the proper business of the trial judge to inquire into the propriety of the prosecution's refusal to grant use immunity to a prospective witness.

In our adversary system the judge best performs his function by remaining completely impartial and objective and keeping entirely apart from the decisions which govern the conduct of the Government's case and the presentation of the defense. As Judge Newman's careful analysis shows, the continuing investigation and the unexpected development of evidence, and the willingness of coconspirators to give evidence, all bear upon the difficult and delicate decisions which prosecutors must make in recommending indictments and in presenting evidence at trial. Even if it were possible for the judge to be sufficiently informed of all the pertinent facts and considerations—which he cannot be—it is highly undesirable that the judge should be asked to bear a burden that is fraught with the danger that his impartiality and objectivity may seem to be, or may actually be, impaired. The judicial function exercised by the judge should not be confused with the executive function to determine how to prosecute defendants and present evidence against them. This important distinction between government functions, which has the firmest possible roots in the Constitu-

tion itself, is expressly recognized in the immunity statute. This statute places the decision to grant in the hand of the Department of Justice and they leave to the court only the ministerial function of granting the order and thus directing that the statute is observed.

I see nothing in theory, or in practice, to be gained by any procedure whereby the prosecutor may be called upon to state that he has reason to believe that the intended witness is a possible defendant. Theoretically, the response of the prosecutor is simply that his refusal to agree to use immunity is justified by the mere claim of the witness. The witness presumably knows more about his own involvement in the allegedly illegal activities of the defendant. Consequently, the government cannot be expected to forego the unrestricted use of the witness' testimony, and cannot be required to undergo the difficulty of managing separate staffs to ensure compliance with a restriction that no use may be made of what the witness might say.

It is not difficult to see what will happen if we suggest that trial judges should examine claims of defendants that use immunity should be granted to prospective witnesses who otherwise would refuse to testify under the Fifth Amendment. Let us suppose the prosecutor has indicted five defendants. Each one could claim that one or more of his co-defendants would, if granted use immunity, give testimony favorable to his defense. There would then be five separate trials, as it would be difficult for the judge to find that the defendant's claim is groundless. To prosecute five separate trials the prosecutor's office would have to create five separate and completely different staffs of attorneys to insulate the prosecutor from any later claim that some use had in fact been made of testimony given by the defendant when he was a witness for a co-defendant at an earlier trial.

In many cases the witness will assert that his lawyer really cannot know whether the witness (who may think himself to be an innocent bystander) might, short of immunity, be providing a missing link in the chain of circumstantial evidence. The prosecution can then ask that the proposed wit-

ness be examined by counsel, *in camera* and under oath, to determine whether there is in fact a good faith assertion that the witness' testimony may tend to incriminate him. The knee-jerk use of the Fifth Amendment by witnesses is usually a device to avoid the unpleasant and embarrassing experience of testifying against a friend or someone whose retaliation is feared. Although everyone knows this, the claim of the Fifth Amendment privilege is hardly ever questioned even when witnesses use it to avoid stating their address or occupation or whether they know a person.

Thus, if we are to open the door to collateral proceedings to determine the propriety of the prosecution's refusal to give use immunity to intended witnesses, the district courts should also be prepared to spend some time inquiring into the good faith of Fifth Amendment claims which are made as a ploy to get use immunity, or, if use immunity is denied, to use the denial as a ground for appeal after conviction. The prosecutor's request for such a hearing to test the good faith of the claim would surely be entitled to as much consideration as would be the demand for use immunity because experience teaches that it is far more likely than not that there is no basis for the claim.

In sum, I do not see how the prosecutor's refusal to grant use immunity to a witness, who suggests by his claim of immunity that he might well be a suitable target for investigation, can ever be considered improper interference with the production of evidence.

Every unnecessary disclosure of information by the prosecution increases the difficulties of administering criminal justice: whether or not the prosecutor has any evidence about the potential witness is information which may be of value to the witness. A prosecutor may have an indication not rising to the level of admissible evidence or even to the point where it could be considered "persuasive" (albeit inadmissible) by a trial judge. If the judge rejects the *ex parte* submission of the prosecutor, then the potential witness may be relatively certain that his activities are undiscovered. Clearly such a procedure may have great value to the wrongdoer.

Indeed, by suggesting that there may be cases where the court should inquire of the prosecution about use immunity, we invite wrongdoers to come forward as potential witnesses to ascertain if they have been discovered. It is apparent that the district courts may expect an increasing number of applications for use immunity inquiries.

Moreover, the requirement that some record be made of the prosecutor's response presents obvious dangers. Such material which may be of great value to the wrongdoer-potential witness will necessarily be disclosed to others beyond those who need to know—a typist, a clerk, a reporter or other aide.

For these reasons, I conclude that the potential harm to the administration of criminal justice which is involved in any inquiry into the grant of use immunity to a witness so far outweighs any possible need for such a procedure to ensure fair trials, that I would prohibit the district court from entertaining such an application or conducting such an inquiry.