GAUDIN, Judge.
Guy A. Lombard, accused of fatally stabbing John St. Pierre at a high school football game on September 3, 1983, was indicted by a Grand Jury and subsequently convicted of second degree murder by a 12-per-son jury in the 24th Judicial District Court. Lombard was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
On appeal, he assigned four errors; however, most of Lombard’s brief and all of his counsel’s oral argument before this Court dealt with only one of these assignments: It was reversible error for the trial judge not to grant use immunity to a defense witness who would otherwise assert the privilege against self-incrimination and refuse to testify.
Lombard’s other assignments of error are:
(1) The trial judge gave an inadequate jury instruction,
(2) The prosecutor’s closing argument was inflammatory, and
(3) The evidence did not support the second degree murder conviction, instead supporting, at best, only a manslaughter conviction.
For the following reasons, we are of the opinion that Lombard was not denied due process and that he received a just and fair trial. We affirm his conviction and sentence.
Testimony at the five-day trial indicated that St. Pierre had gone to West Jefferson Stadium with a girlfriend, Heidi Jeandron. With the football game in progress, Heidi left her seat to go to the restroom, only to find, she said, her path blocked by Lombard. As Heidi nudged her way past Lombard, she asked: “Do you have a problem?” Lombard said, according to Heidi, that he wouldn't call it a problem but a passion. When she returned to her seat, Heidi again had to push past Lombard.
St. Pierre asked Heidi what had happened. Upon hearing her recount, St. Pierre went to the top of the exit ramp where Lombard was. Words were exchanged, and St. Pierre returned to his seat to watch the rest of the game.
Later, when St. Pierre and his date were attempting to leave the stadium, they had to go past Lombard, who was still standing at the top of the exit ramp. More words were exchanged, but St. Pierre and Heidi continued on their way down the exit ramp.
Lombard then grabbed his genital area and made an obscene gesture toward St. Pierre, whereupon St. Pierre took off his eyeglasses and handed them to Heidi and returned up the ramp to where Lombard was. St. Pierre hit Lombard and a fight ensued, during which Lombard removed a knife from his pocket and stabbed St. Pierre twice.
Lombard said:
“... I was gasping for air, he was breaking my arm, and so, I took my right hand and I got my knife, and I swung. I needed to get some air, I didn’t want to kill him, I just wanted to get some air. I wanted to get my arm from him.
“... I swung once, and he didn’t stop. He kept shaking me. So, I swung again.”
The first wound was inflicted on the left side of St. Pierre’s chest, the second in his upper right leg. An ambulance took St. Pierre to a nearby hospital where he was pronounced dead.
Appellant was arrested at the stadium but his knife was never found. He said that moments after the fight, he had given the weapon to his friend, Randall (Randy) Bruner, who had accompanied him to the game.
ASSIGNMENT NO. 1
In this assignment of error, Lombard contends that a person accused of a crime *785 has a constitutional right to present a defense; and that right, in appropriate circumstances, may require the trial judge to grant use immunity to a defense witness who refuses to testify because of the Fifth Amendment’s self-incrimination privilege, íhe witness in question is Randy Bruner.
After the presentation of the State’s case, Lombard’s trial attorney, Thomas Divens, outside the jury’s presence, asked the trial judge “... about the possibility of calling him (Bruner) as a court witness under some sort of structured court immunity.”
Divens explained that Bruner “... has been threatened in the sense that he feels that remarks made by the District Attorney indicate that if he does testify, he will be charged. That is the way he feels, and based on that, there is some reluctance to testify.”
The Assistant District Attorney, Patrick Leitz, replied:
“Your Honor, I told the defendant’s father that I thought he was an accessory to the crime, and if he so testified, he would be charged ...”
Before ruling, the trial judge, with the jury still retired, listened to the sworn testimony of both Randy Bruner and his father, Keith Bruner.
Keith Bruner, a lawyer and a former Assistant United States Attorney, said that earlier, after Randy had been subpoenaed to testify before the Grand Jury, he (Keith Bruner) had made up his mind not to allow Randy to testify “... on the grounds it might tend to incriminate him.” Presumably, Keith Bruner knew of his son’s involvement in the stadium incident. Randy did not testify before the Grand Jury, nor at trial, except during this interlude.
After both Bruners had taken the stand, Leitz said:
“... he (Randy) is a potential defendant. The information which we have, and the testimony which we presume that the defendant would give, he would be charged as an accessory to murder, of accessory after the fact, murder.”
The prosecutor presumed, correctly, that Lombard was going to later say that just after the fight was over, he had given his knife to Randy.
The trial judge denied Lombard’s motion, and correctly so. In considering the merits of this assignment of error, we shall first consider the use of defense witness immunity in any Louisiana case, then the applicability of use immunity to Lombard’s trial.
There is no statutory authority for defense use immunity in this State. The immunity statute, LSA-C.Cr.P. art. 439.1, gives the Attorney General and the District Attorney the right to jointly request immunity for a witness whose testimony- “... may be necessary to the public interest.” A defendant’s justification for seeking immunity for a witness is vested in the Sixth Amendment to the United States Constitution and in Art. I, Sec. 16 of the Louisiana Constitution of 1974, both of which give a person accused of a crime the right to present a defense.
In 1980, the United States Court of Appeal for the Second Circuit, in United States v. Turkish, 623 F.2d 769, writs denied at 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800, dwelled at length on the history and validity of defense use immunity.
The majority opinion, authored by Judge Newman, states in part:
“Granting immunity to a defense witness at the defendant’s request seems to have been considered for the first time, in a reported decision, by Chief Justice Burger, then a Circuit Judge, as dictum in Earl v. United States, 361 F.2d 531 (D.C. Cir.1966) ... cert. denied, 388 U.S. 921 [87 S.Ct. 2121, 18 L.Ed.2d 1370].... Since then it has been much discussed by courts and commentators. Interest in defense witness immunity was considerably heightened after Congress enacted the ‘use’ immunity statute, 18 U.S.C. Secs. 6001-6005, in 1970, and the Supreme Court subsequently upheld its constitutionality, Kastigar v. United States, 406 U.S. 441 [92 S.Ct. 1653, 32 L.Ed.2d 212] (1972) ... No longer did an immuni *786 ty grant forbid prosecution of the witness for crimes referred to in his testimony (‘transactional’ immunity). Now the Government could still prosecute the witness; it was barred only from making any use of his immunized testimony, either directly by putting the testimony in evidence at the witnesses' trial, or indirectly by obtaining other evidence from leads that the testimony supplied.”
The opinion went on to say that defense use immunity had been uniformly rejected by the Second Circuit and by most other federal appellate courts.
The defendant in Turkish, charged with income tax and conspiracy offenses, was denied his request for use immunity both in the district court and on appeal because none of the witnesses sought to be immunized would provide material, exculpatory evidence.
Judge Lumbard, a member of the Turkish panel, affirmed the conviction but dissented in part, being of the opinion that a trial judge should never have the authority to grant immunity to a defense witness. He wrote:
“I concur in affirming the conviction. I dissent, however, from the observations in Judge Newman’s opinion which imply that under certain circumstances the district court would be under the duty of inquiring into whether or not the prosecution should grant use immunity to a prospective defense witness. In my view it is not the proper business of the trial judge to inquire into the propriety of the prosecution’s refusal to grant use immunity to a prospective witness.
“In our adversary system the judge best performs his function by remaining completely impartial and objective and keeping entirely apart from the decisions which govern the conduct of the Government’s case and the presentation of the defense ...
“Even if it were possible for the judge to be sufficiently informed of all the pertinent facts and considerations — which he cannot be — it is highly undesirable that the judge should be asked to bear a burden that is fraught with the danger that his impartiality and objectivity may seem to be, or may actually be, impaired. The judicial function exercised by the judge should not be confused with the executive function to determine how to prosecute defendants' and present evidence against them. This important distinction between government functions, which has the firmest possible roots in the Constitution itself, is expressly recognized in the immunity statute. This statute places the decision to grant in the hand of the Department of Justice and they leave to the court only the ministerial function of granting the order and thus directing that the statute is observed.
“... I conclude that the potential harm to the administration of criminal justice which is involved in any inquiry into the grant of use immunity to a witness so far outweighs any possible need for such a procedure to ensure fair trials, that I would prohibit the district court from entertaining such an application or conducting such an inquiry.”
In 1981, the Supreme Court of Louisiana, in State v. Mattheson, 407 So.2d 1150, considered a request for defense use immunity by Howard Mattheson, who wanted to call his wife in a prosecution for first degree murder. Mrs. Mattheson was accused of the same murder. The Court, quoting from Turkish at times verbatim, stated:
“There is no statutory authority for a Louisiana court to grant a defense witness use immunity absent a request from the attorney general together with the district attorney for the district in which the proceeding is or may be held. La. Code Crim.P. art. 439.1. Therefore, any judicially-fashioned immunity must arise from the constitutional guarantees of compulsory process or due process.
“Claims for defense witness use immunity have been uniformly rejected by almost all of the federal circuit courts of appeals that have considered the matter. United States v. Turkish, 623 F.2d 769 (2d Cir.1980), cert. denied, 449 U.S. 1077, *787 101 S.Ct. 856, 66 L.Ed.2d 800, and cases cited therein.
"... Traditionally, the sixth amendment’s compulsory process clause gives defendant the right to bring his witness to court and have the witness’ nonprivi-leged testimony heard, but does not carry with it the traditional right to displace a proper claim of privilege, including the privilege against self-incrimination. United States v. Turkish, supra; United States v. Lenz, 616 F.2d 960 (6th Cir.1980), cert. denied, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124. Nor has section 16 of article 1 of the Louisiana Constitution of 1974 been construed to grant such a right.
“Additionally, we do not consider that the due process clause requires that defense witness immunity must be ordered whenever it seems fair to grant it. The essential fairness required by the fifth amendment guards the defendant against overreaching by the prosecutory and insulates him against prejudice. It does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges. United States v. Turkish, supra.
“In the instant case, the defense witness (Mrs. Mattheson) was the subject of pending prosecution for armed robbery and first degree murder. We consider that a trial judge properly rejects a claim for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution. Hence, the trial judge correctly denied defense witness immunity in this case.”
Thus, our Supreme Court agreed with the Turkish majority in holding that a trial judge could, under certain narrow circumstances, grant court immunity.
Lombard contends that Randy Bruner was not a true target of subsequent prosecution and that the Assistant District Attorney said he was merely to suppress favorable, exculpatory evidence. In support of this contention, appellant cites testimony of both Bruners given during the hearing at trial but relating to the Grand Jury investigation, to wit:
Randy Bruner:
“He told me that they wouldn’t — he said they wouldn’t weren’t trying to get me, that they was just — they just wanted to know what happened to the knife. They wasn’t going after me, they just wanted to know what happened to the knife. And he went to talk to my dad. And they just talked.”
Keith Bruner:
“He (the prosecutor) said that (immunity) might be arranged, and I said, ‘Why don’t you check into it right now.’ He left, and he came back and he said, T am more interested in what transpired before (the homicide).’ And I said, ‘Well, let me go to discuss it with him (Randy).’ So, I discussed it with him. He (Randy) said he had no knowledge of any threats before. So, I came back and reported that. And he (the prosecutor) said, ‘Well, I am not interested in his testimony then.’ ”
After being advised by Keith Bruner that Randy “... had no knowledge of any threats ...,” the Assistant District Attorney allegedly said that he wasn’t interested in Randy’s Grand Jury testimony. At trial, however, the prosecutor made it quite clear that Randy could and would be prosecuted as an accessory after the fact if his testimony so warranted, and the trial judge properly denied Lombard’s motion. By so doing he recognized Randy Bruner’s right to assert the Fifth Amendment privilege against self-incrimination. From the trial judge’s viewpoint, there was a real prosecutorial interest in Randy Bruner.
Lombard also argues, concerning this assignment of error, that being charged with being an accessory is minor compared with second degree murder, and that this Court should “... right an imbalance created by prosecutorial misconduct.” This argument is made on appeal and was not presented in district court. Appellant cites Government of the Virgin Islands v. Smith, 615 F.2d 964 (1980), and United States v. Morrison, 535 F.2d 223 (1976), both from the *788 United States Court of Appeal, Third Circuit. Smith was decided in 1980, Morrison in 1976, and both involved distinct cases of misconduct by prosecuting attorneys.
In Smith, the prosecution’s decision not to extend immunity was a decision made “... with the deliberate intentions of distorting the judicial factfinding process;” whereas in Morrison, an Assistant United States Attorney repeatedly warned a prospective defense witness about the possibility of a federal perjury charge and then conducted a highly intimidating personal interview.
Here, however, we find no prosecu-torial misconduct. While the Grand Jury was in session, the Assistant District Attorney spoke briefly and but once to Randy Bruner, and then allegedly told Keith Bruner that if Randy wasn’t able to give pertinent testimony about what either Lombard or St. Pierre had said prior to the fight, he wouldn’t be called before the Grand Jury. This would not preclude a criminal charge if Randy later gave self-incriminating testimony during the trial, and the Assistant District Attorney so advised the trial judge. There were no harrassing threats and there was no intimidation; and if the prosecution was attempting to distort the court’s fact-finding process, the record does not so indicate.
The trial judge found that there was an apparent prosecutorial interest in Randy Bruner, and we cannot say that he erred.
ASSIGNMENT NO. 2
Lombard, alleging self-defense, maintains that while he and' St. Pierre exchanged words, this verbal clash did not automatically make him (Lombard) the aggressor, did not justify St. Pierre’s physical attack and did not deprive him (Lombard) of the right to defend his person. Accordingly, it was error for the trial judge to refuse to read the following requested jury charge:
“Mere words, even though uttered and designed to incite or irritate, cannot excuse a battery. Thus, if you find that the defendant uttered words which were designed to incite or irritate the victim, such words are insufficient to justify an attack upon the person uttering such words. Morneau v. American Oil Company, 272 So.2d 313 (La.1973).”
In Morneau, which was a civil action for damages, the plaintiff said “God damn” in the presence of the defendant’s wife. Immediately thereafter, a few words were exchanged and the defendant “... slapped or hit ... ” the plaintiff. The Supreme Court of Louisiana, in deciding for the plaintiff, held that words alone, even though designed to excite or irritate, do not excuse a battery.
LSA-C.Cr.P. art. 802 requires the trial judge to instruct the jury as to the law applicable to the case. LSA-C.Cr.P. art. 807 deals with special written charges, and it reads:
“The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
“A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.”
The trial judge here was not under an Article 807 mandate to read the requested charge. Such a reading would have necessitated some sort of qualification or explanation as the requested charge was not “... wholly correct and pertinent ...” to the facts and circumstances of the stadium incident. More than “mere words” were involved in the events leading up to the fatal stabbing, and whether or not to read the requested charge, with the necessary qualification or explanation, was within the trial judge’s sound discretion.
*789 The charge read to the jury included the following instructions on self-defense and aggression:
“A homicide is justifiable if committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
“The danger need not have been real as long as the defendant reasonably believed that he was in actual danger. “Some factors that you should consider in determining whether the defendant had a reasonable belief that the killing was necessary are:
“(1) the possibility of avoiding the necessity of taking human life by retreat; “(2) the excitement and confusion of the occasion;
“(3) the possibility of preventing the danger to himself by using force less than killing; and
“(4) the defendant’s knowledge of his assailant’s dangerous character.
“Thus, if you find:
“(1) that the defendant killed in self-defense; and
“(2) that the defendant believed that he was in danger of losing his life or receiving great bodily harm; and
“(3) that the defendant believed the killing was necessary to save himself from the danger; and
“(4) that the defendant’s beliefs were reasonable in light of the circumstances; “Then you must find the defendant not guilty.
“A defendant who raises the defense that he acted in self-defense does not have the burden of proof on that issue. The State has the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. “A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
“Thus, if you find that the defendant was the aggressor or that he brought on the difficulty, you must reject his claim of self-defense unless you find:
“(1) that he withdrew from the conflict; and
“(2) that his withdrawal was in good faith; and
“(3) that he withdrew in a manner that put his adversary on notice that he wished to withdraw and discontinue the conflict.”
The foregoing instructions on self-defense came from LSA-R.S. 14:20; while the instruction on the aggressor doctrine, saying that an aggressor loses his right of self-defense, is contained in LSA-R.S. 14:21.
This wording was not contemporaneously objected to by either party. The charge would have exonerated Lombard if the jurors had believed his version, i.e., that he had been assaulted and that he thought that he was in danger of receiving great bodily harm and that he was justified in trying to protect himself as he did. The charge also adequately spells out what the prosecution had to prove in order to overcome Lombard’s self-defense assertions and to prove that he was in fact the aggressor.
We have reviewed the entire jury instruction and it was fair to both Lombard and the prosecution. We cannot say there was an abuse of the trial judge’s discretion by his refusal to read the special charge extracted from Morneau and tendered by Lombard.
ASSIGNMENT NO. 3
In this assignment of error, Lombard contends that the trial judge was in error when he denied a defense motion for a mistrial based on the alleged prejudicial remarks of the prosecutor during his rebuttal argument.
The Assistant District Attorney said:
“If you condone this type of behavior then, ladies and gentlemen, I suggest *790 that we have somebody stationed at the gate of each and every football game and as the kids go in we give all of them a knife so that everything will be even. There would be no necessity at the time to conceal a weapon upon your person. Everybody will have a knife. We’ll be back in the days of the wild west. Maybe we can have guns strapped to our hips. This is what Guy Lombard wants you to condone, this type of behavior. But, no, ladies and gentlemen, we can’t digress to where the animals are. We are supposed to rise above that. Homo-sapiens, the human animal. We must rise above, we must process the intelligence to rise above animalistic intolerance. Why was John St. Pierre at the football game? Because he was a football player and he played against these two teams and he had in interest in being there. He didn’t go armed. He went in shorts with his girlfriend. Not with a gang of people, not armed, but with his girlfriend to watch a football game. Was he mingling around blocking the entrance? No, he was minding his business, he was watching the football game. His girlfriend goes to the bathroom and she’s accosted, treated like an animal, a whore.”
In accord with LSA-C.Cr.P. art. 770, the trial judge, upon motion of the defendant, shall declare a mistrial if an utterance made within hearing of the jury refers directly or indirectly to “... race, religion, color or national origin, if the remark is not material and relevant and might create prejudice against the defendant ...”
LSA-C.Cr.P. art. 774 is concerned with the scope of arguments. It says:
“The argument shall-be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
“The argument shall not appeal to prejudice.
“The state’s rebuttal shall be confined to answering the argument of the defendant.”
Lombard, a black defendant charged with killing a white person, argues that Leitz’s rebuttal statements injected racial considerations into the jury’s factfinding process and were prejudicial. The appellant points out that Leitz is the same prosecutor whose closing arguments were criticized by the Louisiana Supreme Court in State v. Berry, 391 So.2d 406 (La.1980); State v. Wilson, 404 So.2d 968 (La.1981); and State v. Sharp, 418 So.2d 1344 (La. 1982).
In the instant case, after Leitz said that Heidi "... was accosted, treated like an animal, a whore,” Lombard’s attorney objected, saying the remarks were “highly inflamatory.” In response, the trial judge stated:
“It might be a little excessive and I’m going to instruct the jury to disregard possibly that last statement. It is in the excitement of oral argument and I will again remind you that that is argument of counsel and not evidence.”
This was, in our judgment, an appropriate admonition. Leitz had not referred to the defendant as an animal, as he had done in State v. Wilson, supra, causing reversal of a murder conviction. Here, Leitz did refer to “the days of the wild west” and “animalistic intolerance,” and while we do not condone use of such expressions, we cannot say that this language was racially prejudicial, requiring a mistrial, or that the remarks resulted in substantial prejudice depriving Lombard of a fair trial.
A mistrial is a drastic remedy, and, unless mandated under Art. 770, is warranted only when the admonition is not sufficient to assume fairness. See State v. Williams, 375 So.2d 364 (La.1979); also State v. Lee, 340 So.2d 180 (La.1976), in which the Supreme Court of Louisiana, quoting from State v. Jackson, 227 La. 642, 80 So.2d 105 (1955), said that even if objected-to language is impermissible, its use does not constitute reversible error unless the court is thoroughly convinced that the jury was influenced by the remarks, and *791 that they contributed to the verdict. See also State v. Messer, 408 So.2d 1354 (La. 1982.)
A trial judge is accorded wide discretion in confining arguments to the scope of the evidence. Considering the cited remarks in context to the entire argument, together with the trial judge’s admonition, we cannot find either that Lombard was statutorily entitled to a mistrial, as per the dictates of Art. 770, or that the trial judge abused his discretion in admonishing the jury and refusing to order a mistrial.
ASSIGNMENT NO. 4
Relying on Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), Lombard claims that there was insufficient evidence to uphold his conviction and that, at best, the evidence supports only manslaughter. The Supreme Court of Louisiana, in State v. Hicks, 395 So.2d 790 (La. 1981), and in many other cases, declared that a defendant is not afforded due process if the evidence, considered in the light most favorable to the prosecution, cannot convince a rational trier of fact that all essential elements of the crime have been proven beyond a reasonable doubt.
The most essential component of second degree murder[1] is that the offender have the specific intent to kill or inflict great bodily harm. Manslaughter[2] is a homicide that would be murder except the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of self-control and cool reflection. The maximum sentence for manslaughter is 21 years at hard labor.
In presenting its case against Lombard, the prosecution, through various witnesses, traced appellant’s steps from the time he arrived at Randy Bruner’s home before going to the stadium to the time of his arrest. Lombard testified that he had armed himself with a knife for “protection,” explaining that his cousin had been killed at a football game in New Orleans.
Lombard’s knife was not a folding pocket knife. At the Bruner residence, appellant showed the knife to Frank Mancuso, who described it as having a fixed four- or five-inch blade. The weapon could more accurately be called a dagger and, unlike a folding knife, could be removed from a pocket ready for instant use.
Marc Blancq, who was among those at Bruner’s house before the game, said that after the initial verbal confrontation between Lombard and St. Pierre, Lombard patted his pocket and said that he had a knife in the event St. Pierre came back.
Another witness, Carl Hartwell, testified that Lombard told him that he was going to fight St. Pierre, that it wouldn’t be much of a fight because he (Lombard) was going to stab St. Pierre and that there was an ambulance on the other side of the field but they were going to need it on the side where Lombard and St. Pierre were.
Appellant admitted that when St. Pierre and Heidi had gone past him and were on their way down the exit ramp, he (Lombard) reached for his genital area and made an obscene gesture. The gesture, Lombard said, was in response to being called unflattering names by St. Pierre, but it was this gesture that touched off the physical encounter.
Specific intent is a state of mind and need not be proven as a fact, but may be inferred from circumstances and the actions of the defendant. Specific intent is the ultimate legal conclusion to be resolved by the factfinders. See State v. Graham, 420 So.2d 1126 (La.1982); and State v. LeCompte, 371 So.2d 239 (La. 1979).
In Graham, the defendant, who was found guilty of second degree murder, interfered in a quarrel between the victim and the defendant’s brother. From the opinion at page 1128:
*792 “He (the defendant) became the aggressor and asked for the beating he received at the hands of the victim. By pulling a knife and slashing the decedent, defendant dramatically escalated the seriousness of the incident ...”
While Lombard said that his life was being threatened, his fight with St. Pierre was nonetheless a scuffle between two teenagers in a crowded football stadium with several of his (Lombard’s) friends standing by. Such an altercation is unlikely to result in a fateful injury unless one of the participants escalates the seriousness of the encounter by having in his possession and making use of a weapon, as in Graham.
Photographs in evidence show St. Pierre as stockily built, but Lombard stands six feet, two inches tall and had played junior varsity basketball at his high school, and there was no indication in the record that St. Pierre was physically stronger than Lombard other than the fact that St. Pierre gained the initial advantage once the fight started.
Considering the testimony and evidence, the jury here could have found that the necessary elements of second degree murder, particularly specific intent, had been proven beyond a reasonable doubt; consequently, the Jackson v. Virginia and State v. Hicks standards of due process were not offended.
CONCLUSION
Finding that none of Lombard’s assignments of error justify reversal, and being of the opinion that due process was not denied, we affirm appellant’s conviction and sentence.
AFFIRMED.

. LSA-R.S. 14:30.1

. LSA-R.S. 14:31