**UNITED STATES of America**

v.

**Anthony R. LA DUCA.**

**Crim. No. 75–56.**

United States District Court, D. New Jersey.

March 10, 1978.

Robert J. Del Tufo, U. S. Atty., Newark, N. J. by George J. Mendelson, Asst. U. S. Atty., Trenton, N. J., for plaintiff.

Steven H. Gifis, Princeton, N. J., for defendant.

## OPINION

STERN, District Judge.

Defendant Anthony La Duca stands convicted of willful embezzlement of funds of the Paper Industry Union Management Pension Fund, in violation of 18 U.S.C. § 664. He now moves, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial on the ground of newly discovered evidence. The claimed newly discovered evidence consists of the testimony of La Duca's co-defendant John Neiman. Neiman had pleaded guilty and was awaiting sentence at the time of La Duca's trial. Called to the stand by La Duca during trial, Neiman invoked his Fifth Amendment privilege and declined to testify. Now, long after Neiman's sentencing and after denial of several applications for reduction of sentence, Neiman states that he is prepared to exculpate La Duca by testifying that he, Neiman, alone was guilty of the crime charged. This case thus presents the recurring and troublesome question: Under what circumstances will a new trial be required where an individual who has invoked the privilege against self-incrimination and has not testified at the trial of his co-defendant comes forward after trial and conviction of that co-defendant and purports to be able and willing to give testimony exculpatory of him.

On February 3, 1975, a federal grand jury returned an indictment charging Anthony La Duca, John Neiman, Guido Rocco, and Herman Levine with conspiracy to steal money from a pension fund, in violation of 18 U.S.C. § 371; embezzlement of money of a pension fund, in violation of 18 U.S.C. § 664; misapplication of bank funds, in violation of 18 U.S.C. § .657; and several other crimes. On November 24, 1975, Neiman pleaded guilty to the conspiracy count. On January 19, 1976, the government moved the trial of La Duca on the embezzlement count alone. The charges against Levine and Rocco were eventually dismissed.

The government's proofs at trial showed that La Duca, a disbarred attorney, met Neiman in federal prison where both were incarcerated, La Duca following conviction on federal perjury charges. Their scheme to embezzle pension funds began at least as early as December 1973, when La Duca and Neiman presented to a New Jersey bank a $100,000 check drawn on an account of the Paper Industry Union Management Pension Fund and payable to the pension fund. Neiman introduced himself to the bank officers as a financial consultant to the pension fund, a position which he did not hold, and he exchanged the check for a $100,000 certificate of deposit payable to the fund. Shortly thereafter, Neiman and La Duca returned to the bank and proposed another transaction. This time they possessed three $100,000 checks drawn on the fund and payable to the bank. They requested that the bank issue three $100,000 certificates of deposit—two payable to the pension fund and one payable to Playmate Enterprises, Inc., a corporation formed by Neiman and La Duca. The bank officers informed Neiman and La Duca that the bank could not issue a certificate of deposit to a private corporation on a check drawn against a pension fund, and refused to participate in the proposed transaction.

Neiman and La Duca took their business elsewhere. According to the testimony of Guido Rocco, then president of the Totowa Savings and Loan Association, they took the three checks to his bank. They proposed to Rocco the same transaction pro-

posed to the first bank. Initially, the Totowa bank was not interested in the transaction because it was not the payee of the checks. La Duca and Neiman left and returned with pension fund checks may payable to the Savings and Loan. They again sought to have the bank issue certificates of deposit, one to the fund, and one to Playmate Enterprises. Rocco advised them that his bank could not do that without a written resolution from the pension fund or cashier's checks in lieu of the pension fund checks. Neiman and La Duca obliged and had one of the checks exchanged for a cashier's check, thereby disguising the source of the funds. The Totowa bank accepted the checks and issued two certificates of deposit, one payable to the fund and the other payable to Playmate Enterprises, Inc.

Neiman and La Duca immediately borrowed $80,000 against the certificate of deposit that was payable to Playmate Enterprises, Inc. This money was deposited in Playmate's checking accounts. Twenty thousand dollars was immediately drawn out in cash. Within several months, the remainder of the money had been withdrawn from the Playmate accounts on checks signed by Neiman and/or La Duca and payable in large part to cash.

La Duca took the stand. His defense was that he was without criminal intent. He testified that he believed that Neiman was authorized to possess monies of the pension fund and to invest them in commercial ventures like Playmate Enterprises, Inc.

The jury deliberated less than two hours and returned a verdict of guilty. The conviction was affirmed by the Court of Appeals for the Third Circuit. Certiorari was denied. La Duca was sentenced to a three-year term; on Rule 35 motion, the sentence was later reduced to 18 months. The defendant is presently incarcerated.

The motion now before the Court is based on the affidavit of John Neiman. Neiman therein states that La Duca approached him early in 1973 with an idea for a business venture. Neiman told La Duca that he would be interested in a partnership and that he, Neiman, could obtain all necessary financing. He states that in late 1973 he was approached by Theodore Potash who offered, for a fee, to introduce him to a source of investment capital. Potash introduced him to James Fabio, the administrator of the pension fund. Fabio was Neiman's source for the checks. In return, Neiman paid Potash and Fabio. According to the Neiman affidavit:

> La Duca had no knowledge of these meetings, nor did he have knowledge of how, where, or why the money was given to me. . . .

Neiman affidavit, Sept. 20, 1977, Para. 8. Neiman further states that:

> Prior to and at the actual time of receipt of the money by me, both La Duca and his wife interrogated me regarding the propriety of the funds and I assured them that it was a perfectly legal business transaction and that the unions made investment loans every day of the year. . . . I am convinced that if the La Duca's were remotely aware that the loans were even tainted by illegality, they would have disassociated themselves from our business ventures immediately.

*Id.*, Para. 10.[1]

This Court is entitled to view with some skepticism a motion for a new trial based on "newly discovered evidence" which exists only because a convicted defendant who had earlier availed himself of his privilege not to testify comes forward later with an affidavit in which he states that he is not prepared to exculpate his co-defendant. Such a claim is inherently suspect. *See United States v. Jacobs*, 475 F.2d 270, 286 n. 33 (2nd Cir.) (Friendly, C.

---

1. Neiman's position is, in part, corroborated by the affidavit of Stuart Vort dated August 30, 1977. In his affidavit, Vort states that in January of 1974, while in La Duca's office, he overheard a conversation between Neiman and La Duca in which "Neiman repeatedly assure [sic] La Duca about the accessability [sic] and legality of the financing obtained and to be obtained by Mr. Neiman." He further states that he did not reveal to La Duca the fact that he had overheard this conversation until after La Duca's conviction.

J.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

Under some circumstances, the granting of a new trial so that such testimony can be presented to a jury is a result which is just and proper. But in the great majority of cases there is an unspoken premise which, once recognized, must cause a court to proceed with caution.

The Court cannot be blind to the real possibility that the defendant who stood trial did not genuinely desire that his pleading co-defendant testify at that trial, and thus that the new evidence is not worthy of belief.

The co-defendant who has admitted his guilt and who is awaiting sentencing is concerned with what the sentencing court will do. That very concern is a potent guarantee of trustworthiness. Once sentence is imposed, however, there is very little to deter the pleading co-defendant from untruthfully swearing out an affidavit in which he purports to shoulder the entire blame. In these circumstances, the possibility of a successful prosecution for perjury is not a sufficient guarantee of trustworthiness. If the new trial motion is granted, two new trials would be required. If the motion for a new trial is denied, a perjury prosecution would probably require a replay of the original trial to establish the untruthfulness of the affiant's statements. Most prosecutors do not have the resources to constantly retry the same issues against the identical defendants.

If a pleading defendant invokes his privilege against self-incrimination at his co-defendant's trial, his testimony does, of course, become unavailable. But there is every likelihood that at that point in time, his testimony was unwanted as well, and what was desired instead was an issue for appeal or for a new trial motion later.

In La Duca's case, the record strongly suggests that this scenario is not a mere hypothetical. The transcript of trial clearly

indicates that La Duca had no genuine wish to put Neiman on the witness stand.

During the course of La Duca's trial, counsel for La Duca proposed instead to introduce Neiman's exculpatory statements through the testimony of attorneys who were present at a post-indictment, pre-trial strategy meeting. The attorneys would have testified, or so it was represented, that Neiman had told them that La Duca was innocent of the charges and that La Duca did not know the source of the funds.

The Court advised that if the government called Neiman as a witness, the defense could, of course, confront Neiman with these statements. If Neiman admitted having made them, there would be no need to call the lawyers to testify. If Neiman denied them, the Court indicated that the defense could impeach him with the prior inconsistent statements.

Counsel for La Duca wanted to know what would happen if the government chose not to call Neiman. The Court suggested that, in that event, the defense could call Neiman and introduce the evidence through him. Counsel for La Duca ignored the suggestion, making clear to the Court that under no circumstances did he want Neiman himself on the stand. Counsel for La Duca reiterated his view that the lawyers' testimony was crucial, whether or not Neiman was called to testify. The Court restated its view that the proper way to get Neiman's testimony before the jury was to call Neiman to the stand.

By this time, the government had disclosed that it had no intention of calling Neiman to testify. Counsel for La Duca still balked at the idea of calling him and, instead, asked that the Court *direct* the government to call Neiman. The Court noted that it was without authority to tell the government what witnesses to call but that it stood ready and willing to enforce the defendant's subpoena power if La Duca wanted to call Neiman.[2]

---

**2.** The text of the relevant exchange is as follows:

MR. LUCIANNA: [counsel for La Duca] If your Honor please, I understand that there was a meeting at the office of an attorney by

the name of Miles Feinstein from Paterson, attended by Mr. Querques, Mr. Greenberg and Mr. Naiman, [sic] and that at that meeting statements were made by Naiman to the effect that this defendant, Anthony La Duca, was absolutely innocent of these charges, that he in fact didn't know where these funds came from, and that he, Mr. Naiman, would acknowledge that he and he alone was the one who converted these union funds and no one else and more especially not the defendant Anthony La Duca.

Now, if your Honor please, I fully propose to bring Mr. Querques and/or Mr. Feinstein or both of them into court and have them testify to this conversation which took place.

THE COURT: All right. . . . if Mr. Naiman testifies for the Government you will first, of course, confront him with this. If he admits saying it there may be no need to call the lawyers for you will establish through the witness himself.

If the witness denies it, then I think clearly you would be entitled to impeach him on the basis of a prior inconsistent statement and you may introduce that evidence.

Fair enough?

MR. LUCIANNA: Yes. Supposing they don't call him?

THE COURT: Pardon me?

MR. LUCIANNA: Supposing they don't call Mr. Naiman?

THE COURT: Then you can call Mr. Naiman.

MR. LUCIANNA: Well, if your Honor please, I think the testimony of these two lawyers is very important in this case whether or not Mr. Naiman is called.

THE COURT: Sir, please.

MR. LUCIANNA: I think it was made under such a time and under such a circumstance that it goes completely to the heart of this case, namely, whether the defendant La-Duca is guilty of any conversion of union funds.

THE COURT: Please. A first year law student would say in response that the statement made in the offices of the attorney is hearsay, that you may certainly use that hearsay if you have an exception to the hearsay rule such as if Naiman takes the stand and testifies in a contradictory manner to that, he may be impeached by a prior inconsistent statement.

But . . ., If Naiman doesn't testify, you just can't call lawyers in to say what Naiman said when Naiman was not under oath, when Naiman was not available for cross-examination.

In the event you want that testimony you call Naiman and if they don't—

MR. LUCIANNA: If your Honor please, most respectfully, I think I have the right to call him regardless of whether the Government calls him or I call him.

\* \* \* \* \* \*

THE COURT: You just have said two contradictory things. If you feel as strongly as your statement and particularly your tone of voice indicates that you do, that the jury should in your words have the benefit of Mr. Naiman's testimony, by all means call him to the stand if the Government doesn't. *The Court will do everything in its power to facilitate your task*, that being to present Mr. Naiman's testimony.

But if all you want to present is what Mr. Naiman may have said to a group of lawyers, . . . that is not presenting Mr. Naiman's testimony. That is just presenting what Mr. Naiman happened to say sometime outside of court when he wasn't testifying at all. This issue may be academic anyway. Let me find out, are you going to call Naiman?

MR. PLAZA: [Prosecuting Attorney] No, sir.

MR. LUCIANNA: There you are.

THE COURT: Then it isn't academic. They are not calling Naiman.

\* \* \* \* \* \*

MR. LUCIANNA: I think you should direct the Government to call him as their witness. He has pleaded guilty before your Honor in this case. He definitely is in possession of knowledge germane to the issues which are being tried in this court and yet the Government is not to call him as their witness.

If your Honor please, those were the extraordinary circumstances under which I decided to bring Mr. Querques and Mr. Feinstein into court and have them testify as to what transpired in their office at the time this man Naiman said unequivocally that my client was innocent of these charges.

THE COURT: . . .

I have no authority to tell the Government who to call as witnesses. I've got authority to make sure they don't suppress evidence in the sense that you become aware of whatever evidence there is. I've got authority so that no one can place any impediments in your path in introducing any evidence which you believe to be relevant to your case.

I have no authority to tell the Government to try not only their case but to try your case as well. I'm unaware of any federal precedent but if you know of one you can cite it to me by which a court can tell the Government it must call witnesses to the stand who are not only favorable to its cause but unfavorable as well.

You don't lack the subpoena power. I stand full force behind you ready to enforce the orders of the court for your benefit. You may call anybody to the stand whom you believe to have evidence which is useful to your case. Do so, if you believe so.

But you cannot require your adversary to call witnesses which may be favorable to your cause. . . .

(Trial transcript, January 20, 1976, 2.114–2.121 [emphasis supplied]).

Later that day, counsel for La Duca stated that he had contacted Neiman's attorney who had advised that he would not permit his client to testify. Counsel for La Duca indicated that he did not have Neiman's address. The defense was still not anxious to take any steps to get Neiman into court. The following exchange occurred:

THE COURT: How can I be of service to you? Do you want Mr. Naiman to come in here?

MR. LUCIANNA: I think he should be brought in, if your Honor please, as the Court's witness, or I will call him. If your Honor decides, I will call him.

THE COURT: Wait a minute. Let's take one step at a time. I'm not calling witnesses but I will facilitate in any way I can your calling of any witness that you want to.

MR. LUCIANNA: Yes, sir.

THE COURT: I cannot prevent any witness from invoking any legitimate privilege that the witness has.

MR. LUCIANNA: I understand.

THE COURT: But on the other hand I can at least guarantee that the full process of the court will be available to you to bring in anybody you desire. Do you want Mr. Naiman in court?

MR. LUCIANNA: Yes, sir.

(Trial transcript, January 20, 1976, 2.217–2.218). Neiman appeared the following day. When asked by the Court whether, if called to the stand, he would testify, Neiman indicated that he would invoke his privilege against self-incrimination. (Trial transcript, January 21, 1976, 3.7–3.8). Neiman was then excused by the defendant without any application that the government or Court make Neiman's testimony available by conferring immunity upon him.

Where the record demonstrates or strongly suggests that the defendant did not desire originally to present the testimony of the witness who invoked the Fifth Amendment, it may not even be appropriate to call the evidence newly discovered or newly available when that witness later reports that he now agrees to speak. At the very least, because the possibility of fraud and collusion is so great, strict scrutiny must be brought to bear on an application like the instant one.

■ An analogous situation exists in a multi-defendant case where one defendant moves for severance on the ground that he desires the testimony of a co-defendant who declines to give up his right to refuse to testify at his own trial. The law has developed to meet this situation by imposing a high standard on the defendant who seeks severance on such grounds. Among other things, the defendant who seeks severance must show a *bona fide* intent to have his co-defendant testify and must show a likelihood that, if severance is granted, the co-defendant will in fact testify. *See, e. g., United States v. Rosa*, 560 F.2d 149, 155 (3rd Cir.), *cert. denied, Sica v. U. S.*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977). The Court notes that there is no guarantee whatsoever that, if the Court were to grant La Duca's motion for a new trial, Neiman would testify for him. Nothing stands in the way of yet another change of heart by Neiman, *after the conviction of La Duca is vacated*, when the case against La Duca is called to trial again.

Any rule of law which would result automatically in a new trial upon the submission of an affidavit like the one in this case would place tremendous and dangerous power in the hands of a pleading co-defendant. It would enable him to give to a co-defendant who chooses to go to trial the gift of a second chance if the first jury should convict, and this where there is substantial doubt as to whether the witness's testimony was even desired at the time of the original trial and thus substantial doubt as to whether that now-proffered exculpatory testimony is worthy of belief.

■ There is a clear path out of this dilemma. It is black letter law that, to establish entitlement to a new trial on the ground of newly discovered evidence, the defendant must show that his failure to learn of the evidence prior to the conclusion of the first trial was not a result of any lack of diligence on his part. *See United States*

v. *Iannelli*, 528 F.2d 1290, 1292 (3rd Cir. 1976); *United States v. Meyers*, 484 F.2d 113, 116 (3rd Cir. 1973); *United States v. Bertone*, 249 F.2d 156, 160 (3rd Cir. 1957). Where the newly discovered evidence is really newly *available* evidence which was known all along, the defendant can demonstrate his due diligence—and more importantly, can establish the *bona fides* of his otherwise suspect claim that he truly wanted this witness to testify at his first trial—by requesting that the government have immunity conferred on the witness pursuant to 18 U.S.C. §§ 6001 *et seq.* (Supp.1973).

▮ It has often been noted that the decision to seek immunity or not for a particular witness rests within the sole discretion of the prosecutor. *See, e. g., United States v. Housand*, 550 F.2d 818, 824 (2nd Cir. 1977), *cert. denied*, 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977). The Court is without power to grant immunity except upon his or her request. *United States v. Berrigan*, 482 F.2d 171, 190 (3rd Cir. 1973). This is, of course, the statutory scheme now in force. No doubt it reflects concern about judicial usurpation of the executive's prosecutorial role. Until 1970, when the federal immunity statutes resulted in the conferring of complete, transactional immunity on a witness, the courts' adamant refusal to interfere in any way with the government's decision to grant or to withhold immunity was easy to understand. The enactment of 18 U.S.C. §§ 6001 *et seq.*, however, which provides only for the grant of use immunity, has operated to change the balance. *But see United States v. Allstate Mortgage Corp.*, 507 F.2d 492 (7th Cir. 1974), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975). Testimonial "use" immunity is sufficient to vindicate fully a witness's Fifth Amendment rights, but it does not operate to foreclose future prosecutions. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). A grant of immunity thus does not infringe upon the government's interest in law enforcement to the extent that transactional immunity would. The availability of use immunity can protect the government's interest in potential .

future prosecution of a witness while also satisfying the interest of the criminal defendant in the presentation of testimony which can exculpate him. *See generally*, Note, *Right of the Criminal Defendant to the Compelled Testimony of Witnesses*, 67 Colum.L.Rev. 953 (1967).

The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . . to have compulsory process for obtaining witnesses in his favor . . . ."

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process.

*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

The courts have generally agreed that the defendant's Sixth Amendment right of compulsory process must give way to the subpoenaed witness's personal Fifth Amendment right against self-incrimination. *See Royal v. Maryland*, 529 F.2d 1280, 1283 (4th Cir. 1976) (Winter, C. J., dissenting); *United States v. Lacouture*, 495 F.2d 1237, 1241 (5th Cir.) (on petition for rehearing), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *United States v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *Holloway v. Wolff*, 351 F.Supp. 1033, 1038 (D.Neb.1972), *rev'd on other grounds*, 482 F.2d 110 (8th Cir. 1973); *cf. Murdock v. United States*, 283 F.2d 585, 587 (10th Cir. 1960). Of course, the government's power to confer immunity on a witness under section 6001, and thus to compel his testimony while preserving his Fifth Amendment right, renders it unnecessary to choose between vindication of one indi-

vidual's Fifth Amendment right and another individual's Sixth Amendment rights.

Nevertheless, the courts have generally suggested that, absent special circumstances, the Sixth Amendment imposes no affirmative obligation on the government to confer immunity on a witness in order to make that witness's testimony available to a defendant. *See United States v. Alessio,* 528 F.2d 1079 (9th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976); *United States v. Lacouture, supra; United States v. Jenkins,* 470 F.2d 1061 (9th Cir. 1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973).[3]

For me, however, if a court did find that the testimony of a witness invoking privilege would exculpate a defendant, and the government withheld the immunity which would make that testimony available to the defendant even while insisting on continuing to prosecute him, a Sixth Amendment breach would occur. *See generally,* Westen, *The Compulsory Process Clause,* 73 Mich.L.Rev. 71, 166–170 (1974). Comment, *Right of the Criminal Defendant to the Compelled Testimony of Witnesses,* 67 Colum.L.Rev. 953, 956 n. 19 (1967); Comment, *A Re-Examination of Defense Witness Immunity: A New Use for Kastigar,* 10 Harv.J.Legis. 74, 79 (1972). *See also* Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases,* 91 Harv.L.Rev. 567 (1978).

Even if the view be taken that the Sixth Amendment imposes no affirmative obligation on the government to take those steps which it alone can take to make available to a defendant the testimony of a particular witness, and even if the Court is powerless to compel the government to immunize a defense witness, it is clear to me that there are circumstances where considerations of fairness, and thus of due process, mandate that the government request use immunity for a defendant's witness or be barred from prosecuting the defendant. *Cf. United States v. Morrison,* 535 F.2d 223, 229 (3rd Cir. 1976). See also *United States v. Gaither,* 176 U.S.App.D.C. 274, 539 F.2d 753 (1976) (statement of Bazelon, C. J., as to why he voted to deny rehearing *En Banc*), *cert. denied,* 429 U.S. 961, 97 S.Ct. 388, 50 L.Ed.2d 329 (1977); *United States v. Leonard,* 161 U.S.App.D.C. 36, 66, 494 F.2d 955, 985 n. 79 (1974) (Bazelon, C. J., concurring and dissenting); *Earl v. United States,* 124 U.S.App.D.C. 77, 80, 361 F.2d 531, 534 n. 1 (1966) (Burger, J.), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967); McCormick, *Handbook of The Law of Evidence,* § 143 at 308 (2d ed. E. Cleary 1972).

If the defendant requests that the government confer immunity so that the defendant can have the testimony of a witness he desires, and the government honors the request, the desired testimony will immediately become available and there will be no later claim for a new trial on the ground of newly discovered evidence. If, on the other hand, the defendant requests that the government grant immunity and the government refuses, the court can, at that point, determine whether the defendant can get a fair trial without this witness, and may dismiss the indictment if it determines that a fair trial cannot be had.[4]

---

**3.** Generally, the Sixth Amendment's guarantee of compulsory process has not been construed as entitling the defendant to any more than the physical presence of the witness. Yet, the amendment has been recognized as the source of the government's affirmative obligation under Rule 17 of the Federal Rules of Criminal Procedure to pay for the trial expenses and fees of witnesses of indigent defendants. *See Taylor v. United States,* 329 F.2d 384, 386 (5th Cir. 1964).

**4.** The court may, of course, determine that notwithstanding the unavailability of the witness upon whom the government refuses to confer immunity a fair trial may be had and may permit the trial to go forward. The determination may be based on a proffer by the defendant of what the testimony of the witness would be, *supported by a showing that the profferer has good reason to know.* The court could then determine if the trial could fairly proceed. Even if it does, the government will then bear the risk that, later on, a new trial motion like the present one will be brought and will be granted.

The interests of all parties can be accommodated. The use-restriction immunity statute is not, by its terms, limited to witnesses who testify on behalf of the government. Rather, it is to be employed when "testimony . . . from such individual may be necessary to the public interest . . . ." 18 U.S.C. § 6003(b)(1). The public interest is surely advanced where all testimony relevant to ascertaining the defendant's guilt or innocence is available. And the operation of use immunity—as contrasted with transactional immunity—results in no substantial sacrifice of the public interest in the future prosecution of witnesses who are themselves implicated in crimes.[5]

Even assuming, as the government argues, that the grant of use immunity renders more difficult future prosecution of an immunized witness who has not yet been convicted, that may be the price it has to pay to prosecute the defendant. Where a potential witness, who is also a potential defendant, has evidence which a court finds could exculpate another—even if it is true that *testimonial* immunity could cost the government something—his continued silence could cost the accused everything. The shifting of costs to the criminal defendant is simply not consistent with fundamental notions of fairness. And, to the extent that the defendant wilfully attempts to abuse his right in order to give an immunity bath to his cohorts, a sentencing judge need not be blind to what has happened.

■ Because La Duca failed to request that the government seek use immunity for Neiman, he failed to take those steps necessary to secure the availability of the evidence which he now claims is newly available. He thus has failed to establish that his new evidence entitles him to a new trial. *See United States v. Alper*, 449 F.2d 1223 (3rd Cir. 1971), *cert. denied*, 405 U.S. 988, 92 S.Ct. 1248, 31 L.Ed.2d 453 (1972).

The cases upon which La Duca relies— *Amos v. United States*, 95 U.S.App.D.C. 31,

218 F.2d 44 (1954); *Ledet v. United States*, 297 F.2d 737 (5th Cir. 1962); and *United States v. Guillette*, 404 F.Supp. 1360 (D.Conn.1975)—shout out to be distinguished. *See also Newsom v. United States*, 311 F.2d 74 (5th Cir. 1962). *Amos* is not a Fifth Amendment case. In the others, the court which granted a new trial identified cumulative trial errors or irregularities, found exceedingly thin evidence of guilt, and made manifest its sense that the convicted defendant may have in fact been innocent. It appears that the newly available evidence doctrine was used as a vehicle to correct what the courts perceived to be an unjust result. That is not the case here.

Defendant's motion for a new trial will, accordingly, be denied.

---

**5.** This is particularly true in the case of an already convicted co-defendant, who even then receives only testimonial immunity.