Gabrielli, J.
(dissenting). I am compelled to dissent, for I am of the opinion that none of the three issues discussed by the majority constitutes a basis for reversal.
I
First, my colleagues in the majority conclude that, as a matter of law, it was an abuse of discretion for the Trial Judge to grant the People’s motion to consolidate Indictment No. 143 with Indictment Nos. 117 and 118. Presumably, this conclusion is premised upon a finding that the potential for prejudice was so patent and so substantial that the decision to consolidate clearly exceeded the bounds of judicial authority, even though consolidation was permissible under the relevant statute (CPL 200.20, subd 2, par [c]; subd 4). Yet the precise factors upon which the majority bases its finding of inevitable prejudice remain somewhat obscure.
All three indictments charged defendant with having committed various sex-related offenses, ranging from sexual abuse in the second degree to promoting prostitution in the first degree. Of course, it cannot be the mere fact of similarity among the various crimes charged that is the source of the prejudice, for similarity is the very trait that renders the offenses joinable under the statute.* [1] Thus, it would appear *767 that the majority’s objection to the joint trial of the indictments in this case must be based upon a perceived danger of prejudice resulting from the cumulative impact upon the jury of a large number of similar counts. In my view, however, there was nothing of a substantial nature to be gained by ordering the charges in Indictment No. 143 to be tried separately from those contained in Indictment Nos. 117 and 118..
Indictment No. 143 charged defendant with 64 counts of various sex crimes involving young boys, all occurring between July 1, 1972 and November of 1973: one count of sodomy in the second degree, one count of sexual abuse in the second degree, 20 counts of sodomy in the third degree and 21 - counts each of sexual misconduct and endangering the welfare of a child. Indictment No. 118 contained one count of sodomy in the second degree, one count of endangering the welfare of a child, one count of sexual misconduct and one count of sexual abuse in the second degree. Finally, in Indictment No. 117, defendant was charged with a single count of promoting prostitution in the first degree, a class B felony, and one additional count of endangering the welfare of a child.
Interestingly, defendant made no attempt to have the individual counts in the voluminous Indictment No. 143, which involved eight separate victims, severed and tried separately (see CPL 200.20, subd 3). Yet, it would seem that the danger of prejudice flowing from a repetition of sordid evidence, if it existed at all, would be more likely to arise in a trial involving some 64 counts of similar sexual crimes. In view of defendant’s apparent acquiescence in the notion of a single trial for all of the charges of deviant misconduct recited in Indictment No. 143, I must assume that his objection to a joint trial of Indictment Nos. 117, 118 and 143 was not actually based upon a concern that he would be prejudiced with respect to the four counts in Indictment No. 118, which were substantially similar in nature and degree of seriousness to the 64 counts specified in Indictment No. 143. Instead, as the majority’s opinion suggests, the principal cause for concern was the cumulative impact that the total of 68 counts involving private perversion would have upon the jury’s consideration of the more serious count specified in Indictment No. 117, promoting prostitution in the first degree.
*768 Yet, since there is no necessary relationship between the numerous charges of personal sexual misconduct and the charge of promoting prostitution, it is difficult to see how the jury’s consideration of the latter could have been influenced by the evidence presented to support the former. Common experience teaches us that individuals who repeatedly engage in acts of sexual perversion may appear to be the victims of both their own deviant sexual urges and the efforts of those who would exploit those urges for personal gain. The victims and the victimizers clearly have different roles to play in the mercantile world of perversion for profit, and, just as we as Judges can recognize the distinction between the two roles, we may readily expect that a reasonable jury will be capable of doing the same. In any event, it cannot be said upon the present record that the danger of prejudice with respect to the "promoting” count contained in Indictment No. 117 was so blatant that it was an abuse of discretion as a matter of law for the Trial Judge to refuse to sever that count from the 64 other counts of sexual misconduct recited in Indictment No. 143.
In an apparent recognition of the weakness of its conclusion, the majority seeks to bolster the case for severance by observing that defendant asserted before the trial court that he wished to testify on the felony counts in Indictment Nos. 117 and 118, but that he further wished "to exercise his constitutional right under the Fifth Amendment not to testify [concerning] the events alleged in Indictment No. 143”. It is difficult to discern, however what bearing this observation has upon the majority’s ultimate holding.
As the majority opinion notes, "severance based on such ground is [not] available for the mere asking” (People v Dodge, 72 Misc 2d 345, 348). Although severance of joined counts may be required in cases where a joint trial would materially impair the defendant’s right to refrain from testifying on one count by reason of his compelling interest in testifying in his own behalf on the other counts (see Cross v United States, 335 F2d 987), it is the defendant’s burden to demonstrate to the trial court through concrete allegations that such circumstances exist and that severance is therefore warranted (United States v Jardan, 552 F2d 216, 220, cert den 433 US 912; Blunt v United States, 404 F2d 1283, cert den 394 US 909). Indeed, the defendant must make "a convincing showing that he has both important testimony to give concerning one *769 count and strong need to refrain from testifying on the other” (Baker v United States, 401 F2d 958, 977, cert den 400 US 965). Moreover, "[i]n making such a showing, it is essential that the defendant present enough information — regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other — to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration’ against the defendant’s interest in having free choice with respect to testifying” (id.).
Here, no such specific information was offered by defendant to the Trial Judge. With respect to the various charges contained in Indictment No. 118, defendant’s affidavit merely alleged that he wished to testify on the felony count because "he is the only person in a position to do so”. With regard to the more serious count contained in Indictment No. 117, defendant stated only that his testimony would be helpful to his defense, in that it would "establish that he was not culpable under the statute * * * and in particular that he did not promote or advance prostitution on the one occasion when he was charged with having done so”. Finally, defendant’s affidavit stated argumentatively that "without [defendant’s] testimony it is absolutely impossible to defend against the felony charges contained in [the] two indictments”.
Of course, such conclusory statements were not sufficient under existing case law to establish that defendant has "important testimony” to give concerning at least one of the counts for which he was to be tried. Lacking specific allegations as to the subject matter or relevance of his proposed testimony, defendant’s affidavit gave the Trial Judge no concrete basis for concluding that his need to testify was genuine. In fact as the Trial Judge noted, the sole specific statement made by defendant in support of his motion to sever indicated that his testimony would not be exculpatory or even relevant to his defense.[2]
*770 Similarly, defendant made no showing that he had a "strong need to refrain from testifying” on the charges stated in Indictment No. 143. In this regard, defendant stated in conclusory fashion: "The Court will observe that in Indictment 143 as to each date on which felony counts are alleged, at least two and sometimes three or four persons are alleged to have been present. It is apparent that the defendant has good reason to prefer to rely solely upon his legal defense to these charges”. This rather cryptic assertion was hardly sufficient to permit the trial court intelligently to determine whether a joint trial of the three indictments would materially impair defendant’s freedom to choose whether or not to testify.
In short, defendant’s allegations concerning his desire to testify on the felony charges in Indictment Nos. 117 and 118 and to refrain from testifying on the multiple counts in Indictment No. 143 added nothing to the case in favor of severance. Absent specific allegations on this point, defendant’s bare assertions could not serve to strengthen his position with respect to the motion to sever, and, consequently, the trial court’s decision to deny the motion cannot be considered an abuse of discretion. I pause only to add that I cannot share the majority’s apparent disregard for the significance of "judicial economy” as an important consideration militating in favor of a joint trial of the multiple indictments in this case. While a defendant’s due process rights are always, of course, of paramount importance, we cannot afford, in this era of judicial austerity, to give short shrift to the countervailing need to preserve our judicial resources wherever possible.
II
In reversing defendant’s conviction, the majority has also held, without any support in precedent, that the People may not seek a retrial unless and until the District Attorney agrees to confer immunity from prosecution for perjury upon certain of defendant’s witnesses. This holding is apparently based upon the fact that, at an in camera conference, the District Attorney flatly refused to extend immunity to these individuals and instead stressed that he would press criminal charges if the witnesses’ trial testimony indicated that their previous sworn statements had been false. Because I believe that the majority’s rationale is premised upon a serious misreading of the body of Federal case law upon which it relies, I *771 am compelled to offer my strong opposing views on this aspect of the majority’s ruling.
Like the applicable Federal statute (US Code, tit 18, §§ 6002-6003), our own statutes vest in the District Attorney the sole authority to decide whether to grant or withhold immunity in cases such as this (see CPL 50.30; see, also, CPL 50.20). The courts, as a general rule, do not tamper with the exercise of this discretionary authority, which has been conferred upon the District Attorney by the Legislature as a tool to assist him in implementing the policies of his office (cf. Matter of Kilgo, 484 F2d 1215, 1222). There do exist rare instances in which the District Attorney’s use of his discretionary authority impinges upon the defendant’s fundamental right to due process of law, and, in such cases, it has been suggested that the courts may intervene (see People v Sapia, 41 NY2d 160, 165-166, cert den 434 US 823). Although the majority apparently regards this case as one of those "rare instances”, my reading of the applicable decisions leads me to a contrary conclusion.
The seminal case on this question is Earl v United States (361 F2d 531, cert den 388 US 921). There, the United States Court of Appeals for the District of Columbia refused to reverse a conviction solely on the ground that the United States Attorney had declined to confer immunity upon a defense witness who had become "unavailable” due to the assertion of his Fifth Amendment privilege against self incrimination. In an oft-cited footnote, however, the court observed: "We might have quite different, and more difficult, problems had the Government in this case secured testimony from one eyewitness by granting him immunity while declining to seek an immunity grant for [defendant’s witness] to free him from possible incrimination to testify for [defendant]. That situation would vividly dramatize an argument on behalf of [defendant] that the [immunity] statute as applied denied him due process. Arguments could be advanced that in the particular case the Government could not use the immunity statute for its advantage unless Congress made the same mechanism available to the accused” (361 F2d, at p 534, n 1). This dictum was, of course, based upon the underlying, unobjectionable notion that the prosecutor may not abuse his authority to grant immunity selectively by utilizing it as a device to manipulate the evidence available for trial. The Earl court also noted in passing that the power to confer immunity *772 may not be used cynically as a means of affirmatively suppressing evidence (id., at p 534; see Brady v Maryland, 373 US 83; People v Sapia, supra).
Since the Earl decision, however, the Federal courts have applied the principles articulated in that case most sparingly, holding, for the most part, that the question of the Government’s obligation to confer immunity upon defense witnesses does not even arise unless the Government has itself obtained important prosecution witnesses through the use of its power to grant immunity, a circumstance which certainly does not obtain in the instant case (United States v Lang, 589 F2d 92, 95-96; United States v Wright, 588 F2d 31, 35, and n 3, cert den sub nom. Sorbara v United States, 440 US 917; United States v Bautista, 509 F2d 675, 677, cert den sub nom. Monsivais v United States, 421 US 976; United States v Allstate Mtge. Corp., 507 F2d 492, 494-495, cert den 421 US 999; United States v Ramsey, 503 F2d 524, 532, cert den 420 US 932; United States v Jenkins, 470 F2d 1061, 1063-1064, cert den 411 US 920).[3] Indeed, the Federal courts have been nearly unanimous in their adherence to the general rule that a defendant has no constitutional right to compel the prosecutor to extend immunity to defense witnesses (United States v Niederberger, 580 F2d 63, 67, cert den 439 US 980; United States v Beasley, 550 F2d 261, 268, cert den 434 US 938; United States v Alessio, 528 F2d 1079, 1081-1082, cert den 426 US 948; United States v Stofsky, 527 F2d 237, 249, cert den 429 US 819; United States v Gomez-Rojas, 507 F2d 1213, 1220, cert den 423 US 826; Cerda v United States, 488 F2d 720; United States v Berrigan, 482 F2d 171, 190).[4]
*773 Yet, in the face of this considerable body of Federal case law, the majority has nonetheless concluded that defendant’s rights were somehow infringed when the People refused to confer immunity upon his witnesses. In defense of its holding, the majority relies primarily upon cases such as Webb v Texas (409 US 95) and United States v Morrison (535 F2d 223, cert den sub nom. Boscia v United States, 429 US 824), in which otherwise willing and forthcoming defense witnesses were driven from the witness stand by repeated threats of prosecution for perjury. Indeed, in Morrison, the defendant’s principal witness asserted her Fifth Amendment privilege against self incrimination only after the Government prosecutor had threatened her with prosecution through an intermediary on three separate occasions and had, additionally, summoned her to his office in an unauthorized manner and again raised the threat of prosecution for perjury as well as for other, more serious criminal offenses. Under these egregious circumstances, no one could deny that the Government had, in effect, deliberately suppressed evidence favorable to the defendant and that the appropriate remedy was to condition retrial upon the Government’s agreement to confer immunity upon the frightened defense witness.[5]
*774 The present case, however, is a far cry from Morrison and Webb (cf. People v Sapia, 41 NY2d 160, supra). Defendant does not contend, nor could he on the present record contend, that the District Attorney drove otherwise willing defense witnesses from the stand through the use of threats or other harassing measures. To the contrary, it appears that the idea of making themselves unavailable to testify for defendant by invoking the Fifth Amendment privilege against self incrimination to prevent possible perjury charges came directly from the witnesses themselves, who were acting upon the advice of counsel. Accordingly, this case falls squarely within the general rule that " '[t]he Government cannot be penalized * * * under the Compulsory Process Clause of the Sixth Amendment * * * because [the witnesses] chose to exercise [their] Fifth Amendment rights, thus making [themselves] as unavailable for purposes of testimony as [a] deceased [witness]’ ” (People v Sapia, supra, at p 165, quoting United States v Gomez-Rojas, 507 F2d 1213, 1220, cert den 423 US 826, supra).
Nor do there exist in this case any aggravating circumstances, such as "prosecutorial misconduct”, which would bring into play defendant’s due process rights and thereby take the case out of the general rule (see United States v Rocco, 587 F2d 144, 147, n 10, cert den 440 US 972; United States v Saettele, 585 F2d 307, 310-313 [Bright, J., dissenting], cert den 440 US 910; see, also, United States v Herman, 589 F2d 1191, cert den 441 US 913).[6] Although the majority goes *775 out of its way to characterize the District Attorney’s position as "threatening” and "menacing”, such characterization is patently unwarranted, for it is plain even from the majority’s recitation of the relevant facts that the District Attorney did no more than inform the court and the parties, upon inquiries initiated by them, that he was unwilling to forego his right to prosecute the witnesses if their trial testimony revealed that they had committed the crime of perjury on a previous occasion. In so doing, the District Attorney was not "suppressing” evidence material to the defense, but rather was simply refusing affirmatively to aid defendant in his quest for favorable testimony by extending immunity to otherwise recalcitrant witnesses. That "[t]he ultimate effect was to deprive defendant of any direct witnesses to his side of the story” (p 759), as the majority suggests, is of no analytical significance, since, in this case, the underlying source of the deprivation was the voluntary decisions by the witnesses to refrain from testifying; the District Attorney contributed to this "ultimate effect” only indirectly by refusing to induce the witnesses to testify through a grant of immunity.* ****[7] Unless we are prepared to hold that the People have an absolute obligation to confer immunity and to forswear any possibility of future prosecution for prior perjury whenever a material defense witness asserts his Fifth Amendment privilege against self incrimination, I cannot see how we can conclude upon the facts in this case that defendant has a constitutional right to have his witnesses immunized as a condition to retrial.
*776 Ill
Finally, I must note my disagreement with the majority’s determination that the wiretap evidence in this case should have been suppressed. It is conceded by defendant that the wiretap was carried out in accordance with the applicable provisions of the Criminal Procedure Law (CPL 700.05-700.70), and, therefore, the only remaining issue is whether suppression is required by the existing Federal statutes. Unlike my colleagues in the majority, I would conclude that the applicable Federal statute does not mandate suppression in this case.
The Federal statute, which establishes certain minimum standards for State wiretapping statutes, limits the types of investigations in which wiretapping warrants may be issued to those involving the following crimes: "murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotics drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year” (US Code, tit 18, § 2516, subd [2] [emphasis supplied]). It has been argued in this case that the crime of promoting the prostitution of a minor and committing sodomy with a minor are not encompassed within the broad, catchall category of "other crimes dangerous to life, limb or property”, and the majority has apparently adopted that view. I am unable to concur on this point.
Our State wiretapping provisions were drafted with a view toward bringing New York law into conformity with the Federal statutes and case law. The "designated offenses”, which are delineated in CPL 700.05 (subd 8), were enacted in an effort to elaborate upon the rather broad and somewhat ambiguous list of "designted offenses” outlined in the Federal Omnibus Crime Control and Safe Streets Act (see Denzer, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 700.05, pp 248-249). To the extent that CPL 700.05 (subd 8) covers the types of crimes for which defendant was being investigated, that provision must be regarded as representing a legislative determination that such crimes do indeed present a substantial danger to "life and limb”. And, certainly, it cannot be said that such a finding is irrational in view of the obvious hazards such crimes present to the safety and well-being of the children who are exploited in the marketplace of juvenile prostitution.[8]
*777 Moreover, even if it is assumed for the sake of argument that the Federal statute does prohibit wiretapping in a case such as this, it would not necessarily follow that the fruits of the wiretap need be suppressed (cf. Schwartz v Texas, 344 US 199, 203).* *******[9] Although section 2515 of the Omnibus Crime Control and Safe Streets Act (US Code, tit 18, § 2515) expressly prohibits the use of wiretap evidence in both State and Federal courts when that evidence was obtained in violation of the Federal act, this proscription cannot have any legally binding effect upon the States unless it was enacted by Congress pursuant to the authority granted to it by the United States Constitution. Of course, where Congress acts within the boundaries of its constitutional authority, its enactments must be respected, as the majority notes, in accordance with the supremacy clause of the Constitution (US Const, art VI, § 2).
*778 The difficulty in this case is that there is no clear constitutional authority for the enactment by the Congress of the rule of "suppression” that is embodied in section 2515 of the Omnibus Crime Control and Safe Streets Act. I do not here dispute the power of Congress to enact legislation to regulate the admissibility of certain types of evidence in the Federal courts. Nor can there be any doubt that Congress is empowered through the commerce clause (US Const, art I, § 8, subd 3) to regulate the use of interstate telephone lines and to prohibit or circumscribe such uses as electronic eavesdropping. It is quite another matter, however, to say that the commerce clause gives Congress the power to prescribe rules of evidence for use in State courts as an incident to its power to regulate interstate commerce. Indeed, an attempt by Congress to do so might well constitute a usurpation of the powers reserved to the States under the Tenth Amendment (US Const, 10th Arndt; cf. National League of Cities v Usery, 426 US 833), since, with the exception of the specific limitations on the admissibility of evidence that are mandated by the Fourth and Fifth Amendments (see Mapp v Ohio, 367 US 643), the responsibility for formulating rules of evidence falls squarely within the province of the States acting through their courts and Legislatures (see Jenkins v Anderson, 447 US 231, —, 48 USLW 4693, 4696 [decided June 10, 1980]).
Of course, were the prescriptive provisions of the Federal wiretap statute limited to those that are mandated by the Fourth Amendment as interpreted by the Supreme Court in such cases as Berger v New York (388 US 41) and Katz v United States (389 US 347), there could be no question that they would be binding upon the State courts, since Congress no less than the Supreme Court has the power to prohibit the States from acting in a manner which the Constitution proscribes. But, as the majority notes, "[t]he provisions of title 3 do more than codify bare constitutional requisites”; in fact, they set forth specific restrictions upon the categories of crimes for which wiretapping may be authorized, although there is no suggestion in any of the relevant Supreme Court decisions that the Fourth Amendment mandates such restrictions.
It is my view that, to the extent that these nonconstitutional restrictions form the basis of a legislatively created rule of "suppression”, they encroach upon the right of the States to *779 develop their own rules of evidence, and, consequently, are without binding effect in a State prosecution in much the same manner as a Federal hearsay rule would be of little concern in a State common-law proceeding.[10]
For this reason, I would hold that wiretap evidence obtained in an otherwise lawful manner pursuant to an investigation of crimes encompassed by a State "designated offense” provision such as CPL 700.05 (subd 8) is fully admissible in a State court, notwithstanding that the wiretap itself might have been proscribed by the Federal Omnibus Crime Control and Safe Streets Act because it did not involve one of the Federally designated crimes. In summary, in the absence of a specific constitutional mandate or prohibition, it is within the province of the States, in my opinion, to determine for themselves which criminal acts are sufficiently serious to warrant the use of evidence obtained through electronic eavesdropping; the views of Congress on this point, while persuasive, have no binding effect. Thus, even if it be assumed that the crimes for which defendant was being investigated in this case were not covered by the "designated offense” provisions of the Federal act, that discrepancy would not provide a sound basis for suppressing the wiretap evidence in question here, which, as defendant readily concedes, was obtained in conformity with New York law.
For all of the foregoing reasons, I respectfully dissent and cast my vote to affirm the judgment of conviction.
Chief Judge Cooke and Judges. Jones, Wachtler and Meyer concur with Judge Fuchsberg; Judge Gabrielli dissents and votes to affirm in a separate opinion in which Judge Jasen concurs.
Order reversed and case remitted to Westchester County Court for further proceedings on the indictments.

. CPL 200.20 (subd 2, par [c]) provides:
"Two offenses are 'joinable’ when:
* * *
"(c) Even though based upon different criminal transactions, and even though not joinable pursuant to paragraph (b), such offenses are defined by the same or similar statutory provisions and consequently are the same or similar in law”.
*767 It is not and, indeed, cannot be disputed that the counts in Indictment Nos. 117, 118 and 143 were joinable under this section, and, for that reason, the indictments were proper subjects for consolidation under CPL 200.20 (subd 4).

. Defendant’s affidavit stated that he planned to testify in connection with the promoting prostitution charge "that he never received any money * * * or any other financial benefit” from the events of January 31, 1974. The theory of the prosecution, however, was that defendant had committed a criminal act by "knowingly advancing” the prostitution of a minor and not by "knowingly profiting” from the prostitution of a minor (see Penal Law, § 230.30, subd 2; § 230.32). Thus, defendant’s testimony on the promoting prostitution charge would not have been directly exculpatory.

. For cases in which the dictum in Earl has been applied directly, see United States v Saettele (585 F2d 307, 310, 311-313 [Bright, J., dissenting], cert den 440 US 910), United States v Henricksen (564 F2d 197), United States v Leonard (494 F2d 955, 985, n 79 [dictum]) and United States v De Palma (476 F Supp 775).

. United States v Gaither (539 F2d 753 [Bazelon, J., statement on denial of rehearing en banc], cert den 429 US 961) is not to the contrary. There, Judge Bazelon, in a concurring opinion, merely stated that he had some serious reservations concerning the Government’s absolute right to withhold immunity under the circumstances of that case and, hence, would have preferred if the majority of the appellate panel had made it plain that it was not passing upon the issue in denying the defense motion for a rehearing en banc.
Similarly, it should be noted that the proposition for which the majority cites United States v La Duca (447 F Supp 779) was expressly rejected on appeal. The appellate court in La Duca stated: "The * * * proposition [that the Sixth Amendment or the due process clause mandates that the Government make use immunity available to defense witnesses] has been rejected to date by this as well as other *773 courts of appeals. Rather, it has been uniformly accepted that the grant or denial of immunity is within the sole discretion of the [prosecution]” (United States v Rocco, 587 F2d 144, 146-147, and n 10, cert den 440 US 972, affg United States v La Duca, 447 F Supp 779).

. It has been suggested that there may be situations in which the dictates of due process would somehow empower a court to direct a witness to testify under a limited grant of testimonial or "use immunity”, even without the consent of the prosecutor (Pitler, New York Criminal Practice, 1976 Cum Supp, p 354). In my view, however, the suggestion that a court has inherent authority to confer immunity pursuant to its obligation to ensure due process of law represents a fundamental misunderstanding concerning the nature of the immunity concept. As we have previously observed, the act of conferring immunity from prosecution upon a potential witness is, in essence, an ad hoc suspension of the relevant penal statutes (Matter of Doyle, 257 NY 244, 259 [Cardozo, Ch. J.]). Consequently, the authority to extend immunity and thereby work a temporary suspension of one or more penal statutes may be conferred only by the Legislature, which is, after all, the basic source of our criminal law. Indeed, it has repeatedly and consistently been held that, since immunity, whether "testimonial” or "transactional”, is a creature of statute, the courts have no inherent authority to utilize it as a means of ensuring a defendant’s due process rights (e.g., United States v Lang, 589 F2d 92, 96, supra; United States v Niederberger, 580 F2d 63, 67, cert den 439 US 980, supra; United States v Allstate Mtge. Corp., 507 F2d 492, 494-495, cert den 421 US 999; United States v Morrison, 535 F2d 223, cert den sub nom. Boscia v United States, 429 US 824, supra; United States v Berrigan, 482 F2d 171, 190, supra; Earl v United States, 361 F2d 531, 534, cert den 388 US 921, supra). "Whether the good to be attained by procuring the testimony of criminals is greater or less than the *774 evil to be wrought by exempting them forever from prosecution for their crimes is a question of high policy as to which the law-making department of the government is entitled to be heard” (Matter of Doyle, supra, at p 261).
In our State, the "law-making department of the government” has determined that the authority to grant or withhold immunity for trial witnesses should rest soley with the District Attorney (see CPL 50.30). The Legislature has specifically declined to vest similar discretionary powers in the judicial branch, and nothing in the due process clause of the Constitution can alter or modify that legislative decision. To be sure, there may be situations in which principles of due process and fundamental fairness preclude trial of a defendant unless and until the District Attorney exercises his statutory authority to confer immunity upon a defense witness (see (People v Sapia, 41 NY2d 160, supra). In such cases, however, the proper remedy for the District Attorney’s recalcitrance might be, at best, for the court to dismiss the indictment (see United States v De Palma, 476 F Supp 775, supra) and certainly not for the court to assume for itself the power vested in the District Attorney to confer immunity upon a witness.

. In United States v Herman (589 F2d 1191, 1200, cert den 441 US 913), the United States Court of Appeals for the Third Circuit, commenting upon its earlier decision in United States v Morrison (535 F2d 223, cert den sub nom. Boscia v United States, 429 US 824, supra), stated that Morrison does not stand for the proposition that defendants have "a general sixth amendment right to demand that witnesses of *775 their choice be immunized or that their indictments be dismissed”. Nor do defendants have a due process right to have their witnesses immunized unless they "show that the government’s decisions were made with the deliberate intention of distorting the judicial fact finding process” (589 F2d, at p 1204, citing United States v Morrison, supra). In the instant case, needless to say, no such showing was made.

. The majority apparently also finds it significant that the Trial Judge denied defendant’s request for a "missing witness” instruction to clarify his failure to call Shomer, Dowling and Gary F. to the witness stand. This ruling, according to the majority, only exacerbated defendant’s predicament in establishing a viable defense to the promoting prostitution charge. Yet, the majority does not expressly hold that the refusal to give the requested charge was error, and, indeed, it is doubtful whether error was in fact committed, since "when a Fifth Amendment and testimonial privilege has been invoked by a witness and granted, governmental refusal to grant immunity in order to permit him to testify does not give rise to a missing witness instruction” (Morrison v United States, 365 F2d 521, 524; see United States v Lacouture, 495 F2d 1237, cert den 419 US 1053; see, also, People v Sapia, 41 NY2d 160, 163-164, supra).

. As the majority notes, the list of offenses designated by Congress as proper *777 subjects for wiretapping was intended to encompass crimes that are either "intrinsically serious or * * * [are] characteristic of the operations of organized crime” (Senate Report No. 1097, 90th Cong, 2d Sess, US Code Cong & Admin News, 1968, pp 2153, 2234). I find it difficult to believe, however, that the crimes of promoting the prostitution of a minor and committing sodomy with a minor cannot readily be classified within either of these categories. To be sure, Congress intended to exclude from the reach of electronic eavesdropping such "consensual” sexual offenses as "fornication and adultery” (Senate Report No. 1097, at p 2187). But, crimes involving the sexual exploitation of children such as are involved here can hardly be analogized to the petty vices of fornication and adultery which take place between consenting adults.

. In Schwartz v Texas (344 US 199), the Supreme Court considered the effect of section 605 of the Federal Communications Act, the predecessor of the wiretap provisions of the Omnibus Crime Control and Safe Streets Act, upon the admissibility of wiretap evidence in State courts. Since the Schwartz court found no congressional intent to preclude the use of wiretap evidence obtained in violation of the Federal statute in State courts (accord People v Stemmer, 298 NY 728; Matter of Harlem Check Cashing Corp. v Bell, 296 NY 15), it did not reach and, in fact, expressly declined to decide whether Congress would have had the power to impose such a rule of evidence upon the States had it chosen to do so (344 US, at p 203).
In Lee v Florida (392 US 378), the Supreme Court reconsidered its holding in Schwartz in light of Mapp v Ohio (367 US 643). The Lee court held that, since the exclusionary rule had been applied to the States through the Fourteenth Amendment in Mapp, there was no longer any impediment to extending the statutory rule of exclusion embodied in section 605 to State prosecutions. Since the Lee decision, which represented an early application of Mapp, however, the Supreme Court has not had occasion to consider whether a Congressionally enacted rule of suppression that is not directly mandated by the Fourth Amendment is binding upon the States. Thus, even under the rationale articulated in Lee, it remains an open question whether an otherwise lawful wiretap constitutes an "unreasonable search and seizure” merely because it was conducted in the pursuit of criminal activities which Congress did not deem serious enough to include among the "designated crimes” in the present Federal wiretapping law. And, it further remains to be seen whether Congress has the power to pre-empt State law on this issue.

. To be distinguished are those cases in which the wiretap evidence in question is obtained in violation of one of the procedural guidelines set forth in the Omnibus Crime Control and Safe Streets Act that were modeled directly upon the Supreme Court’s Fourth Amendment analysis of wiretapping in Berger v New York (388 US 41, supra) and Katz v United States (389 US 347, supra). These guidelines are a direct expression of Congress’ authority to implement the guarantees contained in the Fourth Amendment and, hence, may properly form the basis of a rule of suppression that is binding upon State courts.